In re Granville GAMBLIN.

No. 54604.

Supreme Court of Missouri,
En Banc.

Sept. 14, 1970.

Rehearing Denied Oct. 12, 1970.

Jack H. Ross, Clayton, for informants.

Garnet W. Taylor, Clayton, Edward W. Fredrickson, Jr., St. Louis, for respondent.

SEILER, Judge.

This is an original disciplinary proceeding. The informants are the Bar Committee for the 21st Judicial Circuit. Following a formal hearing, the committee unanimously found there was probable cause to believe the respondent guilty of professional misconduct. An information in two counts was then filed in this court. After answer, we appointed Honorable Ray Weightman, a retired circuit judge, as special commissioner. He conducted hearings in Clayton and Bloomfield, Missouri, and then filed his report containing findings of fact, conclusions of law and his ultimate determination that respondent is guilty of the charges set forth against him in both counts in the information and should be disciplined.

Count I charges that respondent undertook to represent Jean Shelby as a party defendant in a divorce suit filed in the Circuit Court of St. Louis County, Missouri, in division twelve, presided over by Judge John D. Hasler. Evidence was heard in the case October 26, November 10, and December 5, 1967. The information charges that between the dates of November 10, 1967, and February 7, 1968, Judge Hasler met at various times with the defendant and discussed the merits of the pending divorce case and disposition of issues therein; that the accused aided in such meetings, was aware of the continuing improper conduct and relationship, failed to prevent such conduct, to make it known to the bench or bar, or to do anything other than condone it. It is further charged that the accused conferred with Judge Hasler regarding disposition of issues without knowledge or consent of the opposition and on one occasion arranged for the attendance of the judge and defendant at accused's office for a discussion and disposition of certain issues in the case without knowledge or consent of opposing counsel.

It is further charged that on April 29, 1968, while still acting as attorney for defendant, respondent coerced the defendant to execute a document entitled "Retraction", wherein defendant under oath acknowledged she had theretofore made statements under oath which were untrue regarding the accused's knowledge of her meetings with Judge Hasler; that she was fully advised of the effect of such retraction, and signed it of her own free will when, in truth, she was not so advised, did not sign it of her own free will and the document was prepared solely for the benefit of the accused without regard to the interest or welfare of his client.

Count II alleges that in 1939 the accused was entrusted by Myrtle Henderson with the possession of a quitclaim deed executed by her and conveying the Henderson farm in Dent County, Missouri, to her son, Vernon Henderson, which deed the accused was instructed by Mrs. Henderson to deliver upon her death to the grantee. On September 14, 1963, after the death of Mrs. Henderson, the accused arranged to meet with Vernon Henderson, his daughter, Mrs. June Hilt, and her husband, Leigh Hilt, at the accused's office where he made known to them his possession of the deed. At that same time there was on file in the probate

court of Dent County, an instrument purporting to be the last will of Myrtle Henderson, which purported to devise the Henderson farm to another person, Dorman Steelman. The information charges that the accused suggested to Mr. and Mrs. Hilt that he be employed for the purpose of filing the quitclaim deed for record and performing other acts in connection with establishing ownership of the farm ultimately in Mrs. Hilt. It is further charged that the accused established a fee for his services of $6,000 and caused Mr. and Mrs. Hilt to execute a note secured by a deed of trust on the farm in acknowledgment of such fee obligation, which note was eventually sold by the accused to a third party and then collected in full. The information charges further that the services performed and to be performed were in no way commensurate with the charge and that the accused coerced Mr. and Mrs. Hilt in bringing about their agreement to such fee by an implied threat to refuse delivery to Vernon Henderson of the quitclaim deed, contrary to the understanding under which the accused had accepted entrustment of the deed.

Our commissioner has filed his report setting forth the facts and his conclusions and finding the accused guilty of the charges set forth in both counts of the information and that respondent should be disciplined, but without making any recommendation beyond that. Respondent has filed exceptions to the commissioner's report, contending the facts and conclusions under both counts are contrary to the overwhelming weight of the evidence.

■■■ The commissioner's findings and conclusions are merely advisory. It is our duty to review the evidence, In re Woodward, (Mo.Sup. banc) 300 S.W.2d 385. The credibility, weight, and value of the witnesses and the determination of all fact issues necessary to a decision in the case are for this court, In re McLendon (Mo.Sup. banc) 337 S.W.2d 56, but while we can match one statement with another, witness by witness, from the record before us, on credibility we are not in as good a position as the commissioner was to judge who is and who was not telling the whole truth. We cannot but be impressed by the fact that he had ample opportunity to observe three of the principal characters in person—respondent, Mrs. Shelby, and her husband's lawyer, Mr. Schechter. In re Parkinson, banc, 344 Mo. 715, 128 S.W. 2d 1023, 1028; In re Sizer (Mo.App.) 134 S.W.2d 1085, 1117. As to Judge Hasler, the commissioner had only the transcript of his testimony before the bar committee.

The judge involved, John D. Hasler, was convicted by a jury of oppression in office, which was reversed and remanded on appeal by the St. Louis Court of Appeals by reason of insufficiency of the information, see State v. Hasler (Mo.App.) 449 S.W.2d 881. Impeachment was voted by the House of Representatives against the judge and while the impeachment case was pending in this court the judge tendered his resignation to the governor and upon its acceptance, the impeachment case was dismissed as being moot. Thereafter, Mr. Hasler surrendered his license to practice law in this state, which surrender was accepted by the court on June 27, 1969, and his name stricken from the role of attorneys.

Judge Hasler testified before the bar committee, December 11, 1968, that he saw Mrs. Shelby alone on three occasions. The first time was December 4, 1967, in a motel in St. Louis. Mrs. Shelby had testified at length before Judge Hasler on November 10, 1967, the second day of the hearing, and she categorically denied the allegations of infidelity and immoral conduct which had been testified to by a number of witnesses on behalf of the husband at the first day's hearing on October 26, 1967. Judge Hasler testified that after the second day's hearing, perhaps a week or so, he saw respondent in his court room, said he was at loss to know who was telling the truth, that the testimony had been so diametrically opposed on the subject of her conduct, and he said to respondent,

"I wish I knew who was telling the truth in this case, it's hard to see how so many things could vary. I would really like to ask that girl some questions where she would answer the truth." Hasler said he never did ask Mrs. Shelby if he could see her and that he did not point blank say to Gamblin, "I want to see your client"— that he used the word "like", and mentioned to Gamblin "I would like very much to ask your client some questions."

Several months later, around March 5 or, 6, 1968, after the letters which Hasler had written to Mrs. Shelby were discovered and published in the press, Hasler, at the request of his personal counsel, dictated a 6-page narrative statement of his meetings with Mrs. Shelby. This statement, in the part dealing with the first meeting, read, in part: "Upon hearing this testimony I asked Mr. Gamblin if I could see his client." Later Hasler changed this on a copy which he gave Gamblin, so as to read, "Upon hearing this testimony I asked her if I could see her". Hasler testified he did not know why he had written "her", because that was untrue, and that this change may have been made at Gamblin's request, he was not certain. At his criminal trial, Judge Hasler testified he put in Gamblin's copy what Gamblin would have wanted him to put in.

Continuing with Hasler's testimony before the bar committee: Hasler testified the afternoon of December 4, 1967, Mrs. Shelby telephoned him at his office in the court house from somewhere in St. Louis. He said that he was "not at all" expecting such a call, but it was "not a complete surprise". When asked why it was not a total surprise, his explanation was his remark to respondent in his court room a week or so after the November 10th session. When Mrs. Shelby called, his recollection was that she said, "I understand you would like to talk to me or ask me some questions".

Later that evening Hasler got the original depositions in the case from the court house file, took them to Mrs. Shelby at the motel, went over them with her and left them. Hasler had first tried to reach Gamblin by telephone to tell him that if he (Gamblin) had the depositions, she would like to read them, but was unable to reach Gamblin. Mrs. Loretta Hannebrink, the deputy circuit clerk in Hasler's division, testified there was an occasion when the original depositions were missing from the court file; that Hasler told her Gamblin returned them. In the narrative statement which Hasler prepared for his lawyer, Hasler said that he told Mrs. Shelby at the motel to read over the depositions so as to recall her answers made therein some five months earlier, and to have respondent bring the depositions back to court the next morning, since she was going to meet respondent for a conference at 8:00 a. m. Before the bar committee Hasler testified Mrs. Hannebrink told him Gamblin's associate, Earl Davis, handed the deposition to her during the December 5 session of court. Gamblin did not exactly deny returning Mrs. Shelby's original deposition to Mrs. Hannebrink. He did not recall doing so and put his disbelief that he did so mainly on the fact that the court room arrangement was such that he would "be the one fartherest away from the Clerk, across the table, and I wouldn't be the one that would hand it to her" (a rather weak denial). He had no recollection of meeting Mrs. Shelby at 8 o'clock on a morning of trial to review matters, but said it was possible.

Mrs. Shelby testified before the commissioner that after the first day's trial, while still in the court room, respondent told her that Judge Hasler wanted to speak with her alone. She was not sure whether Hasler or Gamblin made the first telephone call to her about a definite meeting.

Mrs. Shelby testified before the circuit bar committee that she could not remember whether it was respondent or Hasler who telephoned her about her first meeting with Hasler, but that the call came to her in Poplar Bluff where she was staying at her mother's house. In her earlier testi-

mony before the House of Representatives in June 1968, she testified Judge Hasler made the call. She drove to St. Louis the next day and in accordance with her instructions went to Gamblin's office to await a telephone call from Hasler as to where they would meet. She told Gamblin about it and waited in his library for the call, which came in from Hasler about 6:00 p. m. Her testimony was that she told Gamblin about this and her other meetings with Hasler and that his response was "Fine", but she shouldn't tell anyone except him.

In her testimony before the commissioner, she testified that the original call to Poplar Bluff was from respondent, who told her to come to his office and wait for a call from Hasler, which she did.

Mrs. Shelby was confronted by her testimony before the grand jury, where in response to a question first by a juror and later by the assistant prosecuting attorney, she testified that her lawyer did not have knowledge of her meetings with Judge Hasler. Her explanation in her testimony before the commissioner was that she was in the same room with respondent while waiting to testify before the grand jury and that respondent had her so confused before she went in the grand jury room that she did not know half of what she was saying. Gamblin's testimony on this point was that although he and Mrs. Shelby did converse while in the room for the state's witnesses, they were not alone and that he did not say anything to Mrs. Shelby in the way of her protecting his interest or about the testimony she was to give to the grand jury. While he could not at the hearing recall what remarks in the newspapers he attributed to Mrs. Shelby, he thought he said to her, "Jean, what do you mean telling these newspaper reporters * * * about things that I have said and done for you, in view * * * of the time and effort that I have put forth in your behalf, and you have not paid me one dime for it. Do you think you're treating me fairly * * * I asked her what she

expected to gain by it * * * didn't she realize she was doing me a tremendous amount of harm * * * why she said it. 'Oh', she says, 'I don't know'"; that he said to her the stories were untrue and she knew it, and she said "Yes", she knew they were untrue.

Respondent flatly denied that he arranged any meetings between Hasler and Mrs. Shelby or that he had any knowledge of such meetings until the matter became known publicly. Respondent, however, would not say positively that Hasler was mistaken about the remark that Hasler testified he made to Gamblin that he would like to talk to his client and get at the truth of the matter.

After the testimony had been completed in the divorce case, respondent filed a second amended cross-bill, to which Mr. Shelby's attorney, Theodore Schechter, filed a motion to strike. He filed the motion in the clerk's office in the morning and had a copy in his office ready to send out in the 5 o'clock mail that evening to opposing counsel, respondent. To Mr. Schechter's surprise, about the middle of the afternoon he was served with a notice from respondent's office to take up his motion to strike, although he had not yet mailed the copy of his motion or made it known to opposing counsel. Mrs. Hannebrink, Hasler's deputy clerk, testified that Hasler asked her what Mr. Schechter was doing there in the clerk's office and she told him he had filed a motion. Hasler then took the file and the motion and she got Gamblin on the telephone for Hasler. Hasler testified that he told Mrs. Hannebrink to call Gamblin because he wanted to get things straightened out on what was going to be done about the second amended cross-bill and the motion to strike because he was getting pressure on all sides to get something accomplished in the case. Respondent denied that Hasler made any such telephone call to him and was unable to explain how the notice to take up Schechter's motion to strike the second amended cross-bill was filed the afternoon of the same day

the motion was filed and before respondent received a copy of the motion.

Mrs. Shelby had custody of the minor children pending determination of the divorce action. She was to let her husband have the children during the Christmas holidays and over New Years, which she did, and then the husband refused to return the children. She importuned respondent to do something about getting the children back. Mrs. Shelby was in Poplar Bluff, but was to be at respondent's office at 9:00 a. m., February 2, 1968. She did not arrive there until about 2:00 p. m. She was unreliable about keeping appointments and when respondent felt assured that she would actually be there he called Judge Hasler and asked him to come to the office to make an order on temporary custody. February 2 was on a Friday and respondent's explanation was that it was difficult to find a court reporter at the court house in Clayton on Friday afternoon and so he suggested they meet at his office because his office secretary would be available there "to keep a record of the proceedings". His secretary, incidentally, testified that she was not in the office that day, but respondent contradicted her on this and said she was mistaken. Mrs. Shelby showed up, as did Judge Hasler. Another lawyer, Earl Davis, who was associated with respondent in the divorce case and who officed with respondent, was also present. He was surprised the judge was coming to their office to discuss the case with them and their client. Respondent's testimony is that he called opposing counsel, Mr. Schechter, to tell him that the parties were at his office, including the judge, and asked him to come over and see if they could not get the matter of temporary custody straightened out, return the children to Mrs. Shelby, and agree on an order to that effect to be made by the judge.

Mr. Schechter testified that respondent called him, said that Mrs. Shelby was there and asked him to come over and that they wanted to talk about getting the children back to Mrs. Shelby. Mr. Schechter refused to come over and said that he had just learned of some very startling developments which would ruin the case for Mrs. Shelby and ended the conversation. The fact was that Mr. Schechter's client had just brought to Mr. Schechter the letters from Hasler to Mrs. Shelby, which the husband had seized from Mrs. Shelby's purse the evening before. Mr. Schechter said that respondent did not inform him that Judge Hasler was there at respondent's office with respondent and Mrs. Shelby.

Earl Davis testified he heard Gamblin's side of the call to Schechter and he thought that Gamblin said Hasler was present, but he had no recollection of a direct statement to that effect.

Hasler's recollection was that Gamblin told Schechter that Hasler was there with them. Hasler testified further that Mrs. Shelby was "raising thunder" about getting her children back; that Gamblin was trying to find out what had gone on with her husband the night before; also that Mrs. Shelby had gotten hold of a letter Hasler had written her mother wherein Hasler had suggested the possibility of the mother having custody of the children and was accusing him of double-crossing her, "was really dressing me down". Mrs. Shelby testified that Judge Hasler told her if custody of the children was what she wanted, that is what she would have.

On April 29, 1968, Mrs. Shelby was back in respondent's office, this time with her husband. She had decided to give up the contest on the divorce and any attempt to obtain the three children who were claimed by her husband, but she wanted to be sure that she got custody of her fourth child, the youngest one, whose paternity was denied by Mr. Shelby.

By this time Hasler's letters to Mrs. Shelby had come to light and also his meetings with her. There had been newspaper stories published, some of the parties had testified before the grand jury, and Mrs. Shelby had testified before a committee of the House of Representatives. By this time, too, Hasler had prepared his narrative

statement and had given Gamblin a copy of it when he came to Gamblin's house one Saturday morning at Gamblin's request to discuss the situation.

At any rate, at respondent's office on April 29, 1968, Mrs. Shelby signed two documents; one was an affidavit in the divorce action where she stated under oath that she wanted to dismiss her cross-bill and her claim for custody of the three older children, moved the court to award permanent custody of these children to plaintiff and that she and her mother have the permanent custody of the youngest child and that she recover nothing in the way of alimony, child support, or attorney's fee.

At the same time she signed a notarized document entitled "Retraction". In the retraction after reciting that she had been fully advised, that she understood it was necessary that she sign and execute the retraction, that she fully understood what she was doing and that she had been fully informed as to the effects of her act, she said that she desired to retract any statements made to the effect that her attorney had any knowledge of her association with Judge Hasler whatever, that she disclaimed any knowledge of any conference which Hasler said he had with Gamblin or of any meetings between Hasler and Gamblin except the one which occurred at Gamblin's office on February 2, at which time Gamblin had called Schechter on the telephone and stated that she and Judge Hasler were in the office and asked Schechter if he would come over, and that this was the only meeting with Judge Hasler and Mrs. Shelby that Gamblin knew about.

Mrs. Shelby's testimony was that while she signed the two documents, the statements in the retraction were not true and she signed it because she wanted Gamblin to prepare a paper which said she would give her husband custody of the three older children if she could keep the baby and that Gamblin told her she would lose all four of them if she didn't, in view of what had come out about her and Judge

Hasler and the baby might be put in a home; that before Gamblin would prepare such a document she would first have to sign the retraction. Mrs. Shelby said that she was not informed or advised by Gamblin as to the possible effect of her putting her signature to such a document under oath.

Gamblin's testimony on this was that he told her she had done him a great deal of harm with the statements she had made to the press, that he put no pressure on Mrs. Shelby to sign it and that she was quite willing to do so; that he considered that in preparing the retraction he was working for his own benefit; that he first wrote it out in longhand and then read it to Mrs. Shelby and they discussed it back and forth and then he dictated the retraction to his secretary, who typed it; that he arranged for a notary public, Virginia Norman, who had an office down the hall, to take Mrs. Shelby's signature and acknowledgment and that she carefully read it over to Mrs. Shelby to make sure she understood it and that it was correct before Mrs. Shelby signed.

Later Mr. Gamblin swore out a complaint against Mrs. Shelby for perjury. A warrant for her arrest was issued and this was one of the reasons why Mrs. Shelby refused to come to St. Louis County to testify before the commissioner. The warrant "expired" and apparently was not renewed, but Mrs. Shelby's testimony was taken not at St. Louis, but at Bloomfield, Missouri.

Respondent was questioned at some length before the commissioner about the occasion when Judge Hasler came to respondent's house one Saturday morning at respondent's request. This apparently was sometime between March 5 or 6 and March 16, 1968. Respondent said he wanted to find out about all the newspaper publicity and wanted to know what Hasler was doing, where he was going, and wanted to see the statement which Hasler had made for his lawyer. By this time Judge Hasler had transferred the divorce case to

another division. Gamblin testified that Hasler pulled a photostatic copy of the document out of a briefcase, made some notes on it during their conversation, and gave it to Gamblin. Gamblin, however, said he did not "dignify" it by reading it at the time or for several days. Gamblin said he could not remember whether either said to the other anything about whether Hasler had in fact asked Gamblin to see his client, but that the changes to "her" from "Mr. Gamblin" were made without his knowledge or request. He was asked about this and if he did not consider the statement to be of great importance to his position. His answer was not until it became urgent, that it was not urgent at the time Hasler came to his house, but became so when it was intimated Gamblin had knowledge of Hasler's association with Mrs. Shelby. Gamblin testified he was receiving unfavorable newspaper publicity because of his connection with the Shelby case but said that at the time the judge came to his house he did not recall whether the newspaper stories were saying that he was the one who arranged the first meeting between Hasler and Mrs. Shelby. Gamblin said he wanted to know what Hasler said, but also said that he did not know of any newspaper statements by Hasler which involved him (Gamblin) as go-between. Gamblin told the commissioner he could not recall whether it appeared in the newspapers that Hasler said he asked him one day after testimony to see his client.

Gamblin said Hasler's testimony before the bar committee about their living-room conference was substantially correct. Hasler testified before the bar committee, "Well, we had a lengthy discussion about some of the facts that he wasn't particularly clear on and that I wasn't particularly clear on and some exchange back and forth about, 'John, is that the way that happened, or did she say that,' or, 'Did you do that,' and we discussed it because here was a series of events that occurred over a period of two months as set out in here in December and January that we were not to-

gether on and there was—as two people could always have, we had different versions about what had happened." Hasler said he could not recall whether the change he made about striking out Gamblin's name and putting in "her" instead of Gamblin was done at Gamblin's request or not.

Gamblin's interest in Hasler's statement seemed to fluctuate. He testified before the bar committee that he did not ask Hasler to bring the statement with him to Gamblin's house, although he said he wanted to see if "Hasler was making me the goat", despite the fact nothing, so he said, had yet appeared publicly which involved Gamblin. Gamblin testified before the commissioner, however, that he went to some lengths to be sure Hasler did bring along the statement. He said he called Hasler's attorney and asked permission to see Hasler's resume and whether Hasler's attorney had any objection. Gamblin also testified he asked Hasler to bring it out. Nevertheless, Gamblin said he made no effort to read it or look at it in Hasler's presence and although Hasler made some changes in it, he did not look at it closely enough to see what the changes were.

This conference between Hasler and Gamblin, on a Saturday, evidently took place March 9 or March 16, 1968, in view of other testimony in the record. The grand jury hearing was on March 19, 1968. By either March 9 or March 16, it was clear that of the three—Hasler, Mrs. Shelby, and Gamblin—only Gamblin could be saved, and that only if he were not involved in the private meetings between Hasler and Mrs. Shelby and if he could account satisfactorily for the February 2nd meeting at his office. It is difficult, therefore, to believe, in view of the alterations favorable to Gamblin which were admittedly made at this Saturday meeting, that Gamblin did not know more about such changes and played a bigger part in their being made than he admits. On the other hand, if Gamblin were in fact innocent, and was not being accused in the newspapers or elsewhere of having par-

ticipated in arranging the meetings between Hasler and Mrs. Shelby or knowing about them—if there were actually no urgent reason why Gamblin needed to know what Hasler had said in his statement to his lawyer—there would seem to be no necessity that Gamblin arrange such a meeting.

■ The commissioner's conclusions were that respondent told Mrs. Shelby that Judge Hasler wanted to see her privately and that if Mrs. Shelby had never known of the conversation between her lawyer and Hasler it is not unreasonable to believe that the relationship which caused Judge Hasler's downfall might have been avoided; that this might have been the case had respondent obeyed the supreme court rules, which Jean Shelby might not have known about. The commissioner was of the opinion that respondent violated rule 4.16 when he failed to use his best efforts to restrain and prevent Mrs. Shelby from meeting with Judge Hasler and when she continued the meetings he further violated the rule in not terminating the relationship of attorney and client; that he failed to expose his client's conduct, failed to uphold the honor and dignity of the profession, failed to inform opposing counsel or the opposing party of the circumstances so that appropriate steps could be taken, and violated rule 4.47 when, for his own self-interest he caused his client to execute the retraction document and made it a part of the public record; that this was not an act for the protection of the public or those charged with the administration of justice.[1]

As to Count I, respondent's main point before us is that the testimony of Mrs. Shelby is "so contradictory, so obviously false that it must be disregarded. She is an incredible witness whose testimony proves nothing." Our commissioner, who heard the witnesses in person, resolved the factual issues against respondent and we

do the same. As the testimony before the bar committee and the commissioner is read, the conclusion is inescapable that Mr. Gamblin knew at least enough of what was going on between his client and the judge who was hearing the case to require action on his part. He should have informed opposing counsel and the bar committee of what he knew and should have withdrawn as counsel for Mrs. Shelby.

We find the facts to be that Judge Hasler did tell respondent that he would like to talk to respondent's client, and that this is why Judge Hasler was not particularly surprised when he thereafter had a call from Mrs. Shelby. We further find that respondent communicated this statement by the judge to Mrs. Shelby and this led to her calling Judge Hasler or his or Gamblin's call to her. We further find that Mrs. Shelby did not keep the fact of her meetings with Judge Hasler to herself, but that she communicated the fact of such meetings to respondent and, in particular, that she informed respondent that Judge Hasler had brought the original depositions to her motel, gone over them with her, and that she returned them the next morning before court opened to respondent, who returned or arranged for them to be returned, to the court file.

We further find that Judge Hasler is the one who told respondent about opposing counsel's filing a motion to strike Mrs. Shelby's second amended cross-bill and that in response to Judge Hasler's suggestion the respondent, the afternoon of the morning the motion to strike was filed, filed with the clerk notice to take up said motion to strike and that this response by respondent was consistent with respondent's knowing that Judge Hasler was helping Mrs. Shelby in the litigation. We further find that respondent improperly arranged for Judge Hasler to meet with Mrs. Shelby and respondent at the latter's office and discuss custody matters and an order for

1. The charge that respondent put his self-interest above his client's by obtaining the retraction is not briefed or argued in in-

formants' brief and is therefore considered abandoned.

temporary custody without the consent or knowledge of opposing counsel. Respondent is therefore guilty of violation of rules 4.03, 4.15, 4.16, 4.29, 4.32, 4.41, and 4.47 and should be disciplined.

Count II: Respondent is 67 years old. He was admitted to the bar in 1927. Before respondent came to St. Louis, he practiced law for 15 years in Salem, Dent County, where he was born and raised. For many years he had there known Myrtle Henderson and her son, Vernon. Mrs. Henderson, a widow, lived on a farm, around 600 acres, which had been in the Henderson family for many years. Her son, Vernon, had been in trouble with the law, had served a sentence or two, had been married several times, and apparently was a problem to his mother, although on occasion he was helpful to her around the farm. Vernon wanted matters arranged so that he would get the farm in event of his mother's death or remarriage. His mother did not care for Vernon's current wife and hence, was not willing to convey the farm to Vernon and retain a life estate. Vernon did not want to rely on a will from his mother because she could change or revoke that at her pleasure. They consulted Gamblin and he suggested Mrs. Henderson make a deed to Vernon and put it in Gamblin's possession with the agreement that she could not recall the deed "except upon her death" (Gamblin must have meant to say upon "his" death) and Vernon could not demand the deed except upon her death or remarriage. So Gamblin prepared a quitclaim deed, dated August 2, 1939, signed and acknowledged by Myrtle Henderson to Vernon Henderson, conveying the farm. The quitclaim deed was put in a business envelope of Gamblin's and there was typed on the outside the following: "Quit-Claim deed from Myrtle Henderson, a single woman, to Vernon Henderson, dated August 2nd., 1939, conveying David Henderson farm; said deed is to be delivered to Vernon Henderson upon the death or remarriage of the said Myrtle Henderson.

"We agree to the above, and have signed our names hereto this 2nd. day of August, 1939.

/s/ Vernon Henderson
/s/ Myrtle Henderson

"Shoudl (sic) Vernon Henderson predecease Myrtle Henderson above deed is to be released to Myrtle Henderson."

There also was a receipt to Myrtle Henderson and Vernon Henderson signed by Gamblin on the same date to the same effect.

Later in the course of events to be related below, Vernon's daughter, Mrs. June Hilt, discovered in Mrs. Henderson's possessions a longhand letter from Gamblin dated July 16, 1945, replying to an inquiry from Mrs. Henderson, where Gamblin wrote: "The quitclaim deed is still in my safe and there it will remain until your death or Vernon's and will be delivered to the survivor, as per the agreement and understanding. Under the law, there is and has been no delivery, and should anything happen to Vernon, your rights will be fully protected. So far as I know, no one knows of the transaction but you, I and Vernon, and should things not go so well with him the farm would also be protected. I do not think you have anything to worry about so far as the deed and your home is concerned."

As set forth in 23 Am.Jur.2d, Deeds, Sec. 101, p. 152, "Practically all courts recognize that an effective legal delivery of a deed may be made by the grantor's manual delivery of the deed to a third person, with directions to the latter to hold the deed during the lifetime of the grantor and upon the latter's death to deliver it to the grantee, intending at the time of the delivery to the custodian to part forever with all right or power thereafter to repossess, retake, or control the deed. Such a delivery is effectual to convey title to the grantee upon the grantor's death * * *" Accord, as to Missouri law, Haer v. Christmas (Mo.Sup.) 312 S.W.2d 66. Further, "Upon the question

of the delivery of a deed placed in the custody of a third person with instructions to deliver it upon the grantor's death, the intention of the grantor is controlling * * * The grantor shows no intent to part with dominion and control of the deed where the understanding is that the custodian shall return the deed * * * if the grantee should predecease the grantor * * *", 23 Am.Jur.2d, Deeds, Sec. 102, pp. 153–54.

The arrangements made by Gamblin leave unascertainable who is going to get the property until it is known whether Vernon does or does not predecease his mother. As said in Masquart v. Dick, 210 Or. 459, 310 P.2d 742, 747: "* * * The event which was to determine who would ultimately acquire the title was not one that was certain to occur, such as the death of one of the brothers, but was wholly uncertain, namely, which one would survive the other. In those circumstances, under the great weight of authority, it is the law that no delivery of the deed takes place and the instrument is inoperative. * * *" As Gamblin recognized in his 1945 letter, with respect to the quitclaim deed, "there is and has been no delivery", and as he said at one point in his testimony "* * * she departed with the right to recall that deed from my office unless Vernon died."

Mrs. Henderson did not remarry. Her death occurred in 1962 and she was survived by Vernon. Her death was not discovered however, until 1963, because Vernon had put his mother's body in the smokehouse, wrapped in rags, which he would spray with disinfectant from time to time. When the body was discovered Vernon was absent, apparently somewhere in Arkansas. He was brought back by the authorities, held in jail at Salem for a short period of time and then returned to the Kansas penitentiary to complete a sentence.

Gamblin, who at this time was practicing in Clayton in St. Louis County, read in the newspapers about the discovery of Mrs. Henderson's body. In his testimony before the bar committee, he said he did not attempt to get hold of anyone[2] and felt no immediate obligation to locate the deed and turn it over to Vernon, but had a telephone call from Mrs. Hilt, who asked if he had any papers or knew anything about the farm. Gamblin told her he had a quitclaim deed in his possession and when he found it he would get in touch with her or Vernon. He tried to call Vernon but Vernon, in jail at Salem, would not accept the call. So Gamblin sent Vernon a telegram reading, "Reference is to your deed to farm which is in my possession. Stop I have no desire nor inclination to represent you in any other capacity or connection whatever. Such was not the purpose of my call." Vernon then called him. They discussed the devising of the Henderson farm to Dorman Steelman, about which there had been a good deal of publicity.[3] Gamblin also told Vernon there were several old judgments against him in Dent County and the minute the deed went on record there would be difficulties with regard to the farm; that if Vernon wanted him to continue to handle the matter he should make arrangements to come to the office. Vernon Henderson called him back and said the sheriff would bring him to the office September 14, and asked Gamblin to call the daughter, Mrs. Hilt, which he did and there was a meeting in Gamblin's office on the 14th. Mrs. Hilt's husband, Leigh, also attended.

The informants claim that Gamblin took advantage of the situation to charge Mr.

---

2. In his testimony before the commissioner, Gamblin said he learned about Mrs. Henderson's death from the newspaper stories, recalled the deed, found it and attempted to call Vernon; that he did feel an obligation to locate Vernon and give him the deed.

3. Mrs. Henderson left a will executed April 4, 1959, prepared by Dorman Steelman, an attorney at Salem, wherein Mrs. Henderson left $1 to her son Vernon, $500 to her granddaughter, Mrs. Hilt, and $500 each to Mrs. Hilt's four children, and the remainder of her property to Mr. Steelman in fee simple.

and Mrs. Hilt a $6,000 fee for filing the quitclaim deed and doing other acts in connection with establishing ownership of the Henderson farm ultimately in Mrs. Hilt, all by threat to refuse delivery to Vernon Henderson of the quitclaim deed. It should be noted the complaint made by the Hilts was filed in April 1964, long prior to any of the newspaper publicity in the Hasler-Shelby case. There is no explanation in the record for the delay until 1968 in resolving the complaint.

According to Gamblin, this is what occurred at the September 14th conference: He advised Vernon and the Hilts they needed a lawyer. He told them, "I thought we could make the deed stick but you didn't know. It was a matter of fact that would have to be resolved by * * * the judge", that it would involve litigation. Vernon asked him to look after his interests. Gamblin said he would and suggested he convey the farm to the daughter so that the deed could go on record with the quitclaim. In addition to the matter of creditors, Vernon would be away in prison and hence not a convenient plaintiff and also his community standing in Salem was not good.

Vernon wanted to know what Gamblin would charge. Gamblin said it was evident that if he did not succeed in establishing title Vernon could not pay him anything. They discussed the value of the farm. Vernon placed it at $30,000 and Gamblin suggested a fee of 25% if he recovered the farm. Mrs. Hilt suggested 20%, to which Gamblin agreed and also said, "I do want you to give me a note and deed of trust to manifest my claim to it because of the creditors and because people have changed their minds with regard—if you accomplish something." All agreed to this. Gamblin also testified there was an oral understanding that if he did not succeed in establishing title in Mrs. Hilt's name he would receive no fee at all, because the note would be worthless, "It had to come from the farm". He testified the note did not express the contingency, because

if it turned out he earned his fee, then he would have a note he could not negotiate. Gamblin conceded there was nothing in his file to show the note was contingent. He wanted, he said, something in writing to assure his fee, but felt his oral assurance that the note would be returned if he did not succeed in getting them the farm was sufficient for the Hilts.

Gamblin suggested further that another deed be drawn so that Vernon would be sure of a life estate in the farm after his release from prison. Vernon executed a quitclaim to Mrs. Hilt and at the following conference on September 16, the Hilts conveyed a life estate to Vernon. The September 14 meeting was hurried, because the sheriff was anxious to return Vernon to the jail in Salem. Mrs. Hilt paid the sheriff's fee of $75 for bringing her father up and back.

Gamblin testified before the bar committee that he never represented to Vernon or the Hilts that Mrs. Henderson's 1939 quitclaim deed "absolutely passed title to that real estate", that there could be a lawsuit between Steelman and Vernon as to whether title did pass on the deed. Then, however, he testified his opinion was the deed did pass title and that if there were litigation, Steelman, because of the circumstances, would be on the unpopular side.

Gamblin stated to the bar committee that he showed the deed to the others at the September 14 meeting, but did not offer to give it to Vernon "because we weren't talking along those lines"; that Vernon did not demand it, although it would have been his duty to deliver it had he demanded it; but when Gamblin explained what he would do, Vernon agreed with it.

Gamblin testified the Hilts returned as agreed on September 16. At that time they executed the quitclaim to Vernon giving him the right to occupy the farm for the balance of his life and signed the $6,000 note and deed of trust, which were pre-

pared by the people in a real estate office across the street, at Gamblin's request.

Gamblin mailed the deeds, note, and deed of trust on September 17 to the recorder at Salem for recording and identification and then proceeded to negotiate with Dorman Steelman. He had three or four conferences with Mr. Steelman and "insisted * * * under threat of will contest, that he renounce his rights as executor and also as the * * * primary beneficiary under her will * * *" Steelman did so by written renunciation and refusal to serve, filed in probate court October 10, 1963, and approved by the court in an order prepared by Gamblin and entered October 26, 1963. Mr. Gamblin had Mrs. Hilt appointed administratrix with will annexed, filed an inventory which showed no real property to be appraised and total personal property of $260.11, then obtained an order permitting her to resign and revoking the letters, so she could proceed as a creditor (having paid the funeral bill of $1,128.55) to apply for refusal of letters, obtained an order of approval, and thus closed the estate on October 26, 1963. He also had the abstract brought to date by Mr. Steelman's abstract company, believing this would provide further protection, because "I don't see how he could certify the title as being in June Hilt * * * without being estopped to claim * * * any interest in that estate."

The other witnesses on the charge contained in Count II, so far as what took place with Gamblin, were the Hilts. Vernon Henderson's deposition was taken, but was not offered by either side and is not a part of this record. The Hilts testified before the bar committee and also before the commissioner.

Mrs. Hilt first learned of her grandmother's death when she received a call from the coroner's office. She and her husband then made several trips to Salem over the next 10 days. They heard about the will and called on Mr. Steelman, who told them the grandmother had left the farm to him. They consulted a lawyer in Rolla, Ronald J. Fuller, on a Sunday, September 1, 1963. He attended the reading of Mrs. Henderson's will in Salem on September 5, 1963, in the director's room of a bank. Vernon Henderson and the sheriff were there and Fuller then filed in probate court a request for notice of any administration proceedings, as attorney for Mrs. Hilt. Mr. Fuller next saw Mrs. Hilt in St. Louis on September 19, 1963. He had heard from sources in Salem that Vernon Henderson had conferred with Mr. Gamblin, who had exhibited a deed to the property made in 1939, and Fuller wanted to find out what was going on. Mrs. Hilt told him that Mr. Gamblin had the deed and she had retained Gamblin to proceed with the matter. Mr. Hilt confirmed this in a letter dated September 20, 1963. Mr. Fuller sent them his bill, which was paid, and this ended his connection with the case. Mr. Fuller testified, by deposition, that Mrs. Hilt seemed to think that the quitclaim deed from the grandmother to Vernon Henderson, having been found, was "the end of it, this settled it all". Mrs. Hilt said they employed Gamblin because he had the quitclaim deed which her grandmother signed.

Mr. and Mrs. Hilt testified that Gamblin telephoned her, saying he had been trying to get in touch with her father and had something of importance to discuss. A meeting was arranged for September 14. It lasted some 20 to 30 minutes, with the sheriff sitting outside waiting for Vernon. Gamblin told them he had in his keeping a quitclaim deed signed by the grandmother years before deeding the farm to Mrs. Hilt's father. Gamblin produced but did not offer to deliver the deed. Gamblin said he would have it recorded, "and inasmuch as that would make the farm my father's property then Mr. Gamblin and my father and myself discussed my father's quit-claiming the farm to me."

The Hilts testified there was no discussion about a fee or value of the farm at the September 14 meeting—simply a dis-

cussion about what would be accomplished with the deed. Gamblin said that with the quitclaim deed it would be easier to secure the farm, but did not say what it would be necessary for him to do other than recording the deed.

Her father signed a quitclaim deed to her. This was Gamblin's suggestion—he thought it would make matters easier, as the father might have to return to the penitentiary as a parole violator and people in Salem "weren't too fond" of her father. It was also agreed the father was to have a life estate in the farm.

At the second meeting, the Hilts again say there was no offer by Gamblin to deliver the 1939 deed, nor did they demand it, as "[i]t had to be recorded". Gamblin brought up the matter of a fee. He said he had held the deed for them for years, that Vernon Henderson owed him past bills, and now that the farm was Mrs. Hilt's, she more or less would be responsible for them, and asked if they thought $6,000 would be too much for his fee. He put the value of the farm at $30,000, which they all thought was about what it was worth, and wanted 20% as his fee. Mrs. Hilt said they were amazed, that recording the deed seemed to her to pretty much clear it up and it was not worth $6,000 to do that, but she eventually spoke up and Gamblin said he could make it difficult for them to get the deed, so they agreed to the $6,000. All Mrs. Hilt could see, she said, was that Gamblin had the deed, unless they got it the will would pass the farm to Steelman, and if they wanted the deed they would have to pay $6,000 for it. The way Mr. Hilt put it was, "He flat out told us it was going to cost us $6,000 or he would make it difficult for us to get the quitclaim deed, period." Mrs. Hilt asked if Gamblin would also help in getting her father released from prison and he said he would. Mrs. Hilt said that while she was "not versed in law matters", she did not think that the mere filing of the Myrtle Henderson deed would obtain the farm for them, but she did not know what else

Gamblin would do and he did not inform them on this. She conceded that at least part of the $6,000 fee was for getting the farm in her name and that her complaint about Gamblin was because of the fee.

Mrs. Hilt said there was no contingency or condition as to the payment of the fee, it was a definite $6,000 fee and both she and her husband signed the note and deed of trust and believed they would have to pay it (both Mrs. Hilt and her husband were regularly employed in responsible jobs). Gamblin told them he would not sell the note or let it get away, but later they received notice from a realty company that they had the note and "we were to make our payments to them". The Hilts paid the interest as called for by the note, $300 per year, for five years, and then paid the note in full. They raised the money by selling 100 acres of the farm for $9,000. Later they sold about 450 acres for approximately $30,000–$32,000. The remainder, around 100 acres, they conveyed to Vernon Henderson absolutely.

Gamblin would never give them any statement of the amount he said Vernon owed him for past services or what it was for, although they tried, particularly Mr. Hilt, to get such a statement from Gamblin. Mr. Hilt said they were going to divide the farm half and half with Vernon, but the $6,000 note was in his and his wife's name, not Vernon's and they wanted to take out of the $6,000 the part that covered Vernon's past debts, but he never was able to get a figure from Gamblin.

Mr. Hilt initiated the complaint against Gamblin. He did so as soon as he got the abstract from Gamblin, which he said took him an additional five months after the estate was closed, even though all bills had been paid and Gamblin had his fee.

Hilt said they did not hire Gamblin in so many words, that when a man had $6,000 of his money he figured he had hired him, that they actually had no choice and "were under the gun"; that while they did not know the law, they felt "if we could get the

quit-claim deed recorded everything would be okay". Hilt also said that if they could have gotten the quitclaim deeds he did not believe they would have needed Gamblin or had to pay $6,000; that Gamblin had the deeds and if he had said 50% they probably would have paid it.

It should also be stated that Mr. Gamblin explained that while he felt he had been employed by Vernon rather than the Hilts, his reason for not having Vernon sign the note was there was not time to prepare the note and deed of trust at the September 14 conference; further that no matter which one signed it, the note would be collected from the farm. He said he had represented Vernon for 15 years and had been paid a total of $90 and when "you represent anyone for fifteen years you feel like if he has a desirable piece of litigation * * * he should refer the matter to you". He denied that the Hilts had asked him to furnish a listing of Vernon's indebtedness. In fact, he testified before the bar committee that he did not take into consideration in fixing the $6,000 fee his past services for Vernon. Mr. Gamblin's final opinion on the validity of the Myrtle Henderson deed seemed to be that it would make a prima facie case, but it would take a quiet title suit to settle the matter. He seemed to believe the condition that if Vernon should predecease his mother the deed would go back to her, did not negate delivery.

As to the amount of time he spent on the matter for the Hilts from beginning to end, when asked if he could say whether it was more or less than 50 hours, he said he would not hazard a guess.

Mr. Gamblin denied that he told the Hilts he would make it difficult for them if they didn't agree to his $6,000 fee; that the only way he could have used "difficult" was that it might be difficult to contest the will and get the title back where it belonged; that talk of his threatening to destroy the deed was "poppycock."

Mr. Paul Brackman, a member of a prominent St. Louis County law firm and of the Board of Governors of the Missouri Bar, was called as witness by respondent. He testified in response to a hypothetical question based on Gamblin's version of the facts that 25% would be a reasonable contingent fee. He also testified that under the circumstances hypothesized he would have felt a responsibility to make delivery of the deed to the grantee, and he would not charge him for that service, and that the contingency with respect to payment of the $6,000 note should have been put in writing.

Mr. Gamblin also called as a witness Matthew J. Maloney, vice president of a title insurance company. Mr. Maloney had worked with Missouri titles since 1937. In response to a hypothetical question based on the Myrtle Henderson 1939 quitclaim deed and her 1959 will, he said the title company would question the delivery of the deed, and before they would pass title there would have to be a judicial determination of the ownership. The same would be true as to merchantability of the $6,000 note secured by deed of trust on the disputed real estate.

Mr. Gamblin also produced affidavits from attorneys who had known him professionally and otherwise for 25 to 50 years as to his honor and integrity, which affidavits were admitted into evidence by agreement that such would be their testimony if called.

Our commissioner arrived at the conclusion that respondent failed to carry out the trust of his client, Myrtle Henderson, upon her death in violation of rule 4.47; further that in fixing his attorney's fees, instead of considering the time and labor required, he considered only his possession of the deed with which he was entrusted and his refusal to deliver it until he was paid $6,000 in violation of rule 4.12; that respondent was not candid or fair in that upon the death of his client, Myrtle Henderson, he did not deliver the deed

to Vernon in violation of rule 4.22; that there actually was not a voluntary hiring of the respondent and that by his conduct he has failed to maintain the dignity, honor, and trustworthiness due the law profession, is guilty of the charges set forth in Count II of the information, and should be disciplined.

Again, as in Count I, the solution of the problem turns largely on questions of fact, which turn on questions of credibility of witnesses. Again, our commissioner, who heard the witnesses in person, resolved the factual issues against respondent and again our reading of the record brings us to the same conclusion. There is no reason for the Hilts to fabricate their complaint against Gamblin. The $6,000 has been paid and the Hilts have nothing to gain or lose financially by the outcome of the case. They were resentful over having to pay $6,000, but we do not believe this colored their testimony materially.

We are of the opinion that respondent took advantage of the situation. Regardless of whether there had been delivery and whether the deed would be effective to pass good title to Vernon Henderson, it was Gamblin's obligation to deliver the quitclaim deed to Henderson upon Myrtle Henderson's death in view of the instructions under which he had the deed. This Gamblin did not do. He used his possession of the deed as a means of coercing employment by the Hilts and obtaining a $6,000 note and deed of trust from them, unconditional on its face in all respects. While he says that he told them it would be collected only if he were successful, he gave them no protection in case something should happen to him or should he change his mind. He failed in an important obligation to his clients. It is true he obtained a good result, but this does not excuse his failure to uphold the honor of the profession in his dealings with the Hilts, or his failure to honor the trust imposed on him by Mrs. Henderson and her son in entrusting the deed to him for delivery on her death, whether it was effective to pass title or not. He has violated rules 4.12, 4.29, and 4.47.

We now proceed to the disciplinary action to be taken. Our purpose is not to punish, but it is to inquire into Mr. Gamblin's fitness to continue in the practice of law, In re Jones (Mo.Sup. banc) 431 S.W. 2d 809. Under all the facts and circumstances in this case we will not order permanent disbarment. It is not necessary to go that far to protect the public, the integrity of the bar, and the courts.

It is ordered that Granville L. Gamblin be suspended and prohibited from the practice of law in Missouri until the further order of this court and that he be permitted to apply to this court for reinstatement after the expiration of two years from the date of this opinion, upon a showing that he is then a person fit to practice law as a member of the bar of this state.

HENLEY, C. J., and FINCH, MORGAN, and HOLMAN, JJ., concur.

DONNELLY, J., concurs in result.

BARDGETT, J., not sitting.