**In the Matter of John J. DWYER, an Active Member of the Bar of this Court.**

No. DP–16–'75.

District of Columbia Court of Appeals.

Argued July 28, 1976.

Decided Feb. 9, 1979.

**2**

Mark P. Friedlander, Washington, D. C., for respondent.

Fred Grabowsky, Washington, D. C., Bar Counsel, for The Disciplinary Bd.

Before HARRIS and MACK, Associate Judges, and REILLY, Chief Judge, Retired.

REILLY, Chief Judge, Retired:

This case is before us on a petition on The Disciplinary Board (now known as the Board of Professional Responsibility) recommending to this court that it suspend a member of the bar, John J. Dwyer, from the practice of law for a period of nine months and that reinstatement at the end of that period should not be automatic, but conditioned upon proof of repayment of some $1,210.00 to the family of Nathaniel B. Henderson, a defendant in a trial for murder in the United States District Court, whom Dwyer had represented as defense counsel in preliminary proceedings as well as in the trial itself. The recommendation is predicated on a finding that respondent, although appointed as counsel under the Criminal Justice Act [1] and thereby entitled to a fee from the government for his services under the provisions of that statute, solicited and obtained an additional fee from Henderson's family as a condition for continued representation at the murder trial.

This finding of the Board was based on a report of a hearing committee, appointed under Rule XI, § 4(3) of the Grievance and Disciplinary Rules of this court, which conducted a hearing on the formal charges presented by Bar Counsel. Respondent Dwyer filed exceptions to the report which had recommended a six-months' suspension (to be reduced to three months on reimbursement of the money collected). In overruling these exceptions the Board, with some additional comments of its own, accepted the findings of fact and conclusions of the hearing committee, but by a 4–1 vote (one member dissenting and two abstaining) recommended that the period of the proposed suspension should be increased from six months to nine (with reinstatement to be automatic on proof of restitution).

The fact that the $1,210.00 was paid to respondent in two separate installments just prior to the trial is undenied. He gave receipts for both payments and in his answer admitted such payments and also that subsequently he had received the sum of $750.00 pursuant to an authorization of the trial court under the Criminal Justice Act for his services in the murder case. Respondent denied, however, that the money paid him by the Henderson family was for his representation, saying the money was voluntarily tendered him as payments on account for an unpaid debt Henderson had incurred for prior services provided by a former partner of the firm, who had been Henderson's defense counsel in an earlier unrelated case—an indictment for rape, twice tried in a Maryland county court and ultimately ending in acquittal.

The complaint which eventually resulted in this disciplinary proceeding was filed by Nathaniel Henderson in August of 1974, one month after beginning a prison term imposed by Judge Pratt in July of that year, after his conviction in the homicide case on June 20, 1974. The complaint stated: "I believe I am entitled to the refund of the fee paid to Mr. Dwyer as an appointed attorney under the Criminal Justice Act." He had previously expressed dissatisfaction with respondent in open court after the guilty verdict was returned, and said: "I

1. 18 U.S.C. § 3006A (1970). This is a federal statute, applicable to courts of the United States.

want my money back." [2] Henderson was not called as a witness at the hearing, nor was any deposition taken from him. Bar Counsel told the hearing committee that the complainant was in prison.

The record shows that Henderson's first contact with the Dwyer law firm, a partnership then called Dwyer and Lamb, occurred in 1970 or 1971, when Maryland authorities sought a writ of rendition on a rape charge. Jean F. Dwyer, a partner, agreed to represent him with the assistance of an associate in the firm, David Lamb, a member of the Maryland bar. Lamb was not present when the fee was set. Mrs. Dwyer's recollection was that she quoted a figure of $1,500.00 to $2,500.00, depending upon the time the case would require, but kept no record of this conversation. The case turned out to be a protracted one. She filed several motions for a preliminary hearing which were denied, and subsequently moved successfully for dismissal of the indictment. After a new indictment was returned, she represented Henderson at two successive trials. In the first, the jury became deadlocked and was discharged; in the second, there was a verdict of acquittal. Records of the old firm, which Bar Counsel arranged to be produced, disclosed that before the Dwyer and Lamb partnership [3] was dissolved, only $510.00 of the fee was paid. Mrs. Dwyer testified that, prior to the payments challenged in the complaint, Henderson still owed a balance of $1,500.00 for the rape case.

While the second Maryland trial was still pending, Henderson was arrested and charged in the District with the murder of a female neighbor. In view of the fact that he was substantially in arrears on payments for the Maryland case, Mrs. Dwyer suggested to Henderson and his wife, Yvonne, who had made some payments in his behalf, that he file an affidavit to qualify as an indigent under the Criminal Justice Act. He did so. Subsequently, Mrs. Dwyer was appointed under that Act, but after she became a federal magistrate, she arranged, with Henderson's approval, that her husband, the respondent, be appointed in her stead. At that time, the United States courts here had jurisdiction in homicide cases.

After his Maryland acquittal, Henderson or his family raised enough money to obtain his release from the District jail on a surety bond in the amount of $6,000.00. Respondent, relying apparently on his client's assurance that he was not present at the scene of the crime, arranged with the United States Attorney for a polygraphic test, which Henderson failed. Then, faced with trial in the District Court, Henderson disappeared before the date he was scheduled to appear (sometime in January of 1973), and a bench warrant was issued. He did surrender about 14 months later. According to respondent, he was immediately notified by Magistrate Burnett that Henderson was again in custody, and went to court to represent him. On this occasion a trial date was set. On June 18, 1974, respondent appeared to represent him at the trial. Henderson was convicted and sentenced. He later pleaded guilty to charges stemming from his flight from the jurisdiction, and Judge Pratt imposed concurrent prison terms in July 1974.

2. Respondent Dwyer testified to this effect, and also told the hearing committee that Henderson had filed a complaint with Judge Pratt before the latter acted on Dwyer's official voucher.

3. This happened in June 1971. Respondent Dwyer's testimony hinted at some friction between him and the brothers, Peter and David Lamb, as the cause of the breakup, for he emphatically stated that under the dissolution settlement David Lamb was not entitled to any share of money paid on cases retained by the Dwyers. He said that at that time there had been a complete distribution of partnership assets and liabilities. Mrs. Dwyer did not leave

until a year later, when she was appointed a magistrate by the United States District Court. After the breakup of the original firm, her husband maintained a joint checking account with her in which fees collected by them were deposited. The couple's daughter, Maureen Dwyer, was a legal secretary at her father's office during the period of the Henderson representation and at the time of the hearing. Dwyer testified that he is currently practicing law under the firm style of Dwyer and Timberlake, but that the arrangement is not a partnership—the two lawyers share office facilities, but have no joint bank account.

Respondent thereafter submitted a voucher under the Criminal Justice Act for his services. The voucher, received in evidence, discloses that respondent claimed a balance due of $925.00 for his services, noting a prior payment of $1,000.00. The trial judge approved payment of $750.00 in January, 1975, while the complaint was still pending before The Disciplinary Board.[4]

Although complainant Henderson did not appear at the hearing, Yvonne Henderson, his wife, testified that on the day Henderson came out of hiding and surrendered, she telephoned respondent, who told her that he was no longer responsible for her husband's case and that she then asked him if he would be willing to take his case for a fee, and was told that if she came to his office he would discuss it. A day or two later, she visited his office with her father-in-law, Lynwood Henderson, and testified that respondent said he would take the case for $1,500.00, the sum of $500.00 to be paid the next week and the balance within 60 days.

She further testified that about a week later[5] she visited respondent's office again, this time accompanied by her mother-in-law, Mrs. Emma J. Gray,[6] who turned over in checks and cash some $510.00 to respondent. On the day of the trial, June 22, 1974, Mrs. Gray paid John Dwyer an additional $700.00, including a check for $200.00, drawn by Yvonne and returned by the drawee bank to the payee as there were no funds to cover it. She told the committee that after the trial she reimbursed respondent for the dishonored check, but never received bills for the unpaid balance of the sum she said had been agreed upon. The witness also testified that in addition to her contributions and Mrs. Gray's, she had also collected the money for the payments from Henderson's father and Mrs. Ford, a sister.

In answers on direct examination, Mrs. Henderson stated that respondent never mentioned a still existing debt for the Maryland case, although she said that they had originally agreed to pay Mrs. Dwyer $1,500.00. She asserted that all but $300.00 of this amount had been paid. Later she told a member of the committee that it was Mrs. Dwyer who had told her that only $300.00 was still due.[7] On cross-examination, respondent's counsel was prevented from eliciting answers to questions concerning what contacts she had with her husband in the 14-month interval after Henderson had absconded—the chairman of the committee sua sponte invoked a claim of privilege on her behalf—or any conversations with him later about the basis of his post-conviction complaint respecting the money paid to respondent.

Respondent, on the stand, gave quite a different version of the crucial telephone call. He said that when Mrs. Henderson informed him that her husband had turned himself in, he told her that he had learned of this from Magistrate Burnett and that a date for a hearing had been set, that he could not accept money because the government was going to pay him for his services, and that having already done his preliminary work, he was prepared to go to trial. Then, expressing some displeasure at Henderson's flight, "when we had the case beat", he asked why Henderson had run away. He was told that the defendant was afraid respondent would hold his unpaid debt to the firm against him. He expressed surprise at the explanation, but when his caller said the Hendersons would feel better

---

4. The voucher, contrary to the assumption of Bar Counsel, shows that it was filled out on a form devised for appointments under 18 U.S.C. § 3006A, the Federal, not the District of Columbia Act. Presumably the prior payment also authorized by a federal court, so that respondent was paid under the Act a total sum of $1,750.00 for representing Henderson in the murder case.

5. This date was May 2, 1974, as evidenced by the receipt given Mrs. Gray at the time.

6. She was the mother of Nathaniel Henderson. She apparently had remarried after divorcing Lynwood Henderson, his father.

7. Mrs. Dwyer denied saying this and the records produced by Bar Counsel showing total payments of only $510.00 refute this testimony. Even if Mrs. Henderson's recollection of a $1500 figure was correct, there was still an unpaid balance of $1000 in 1974.

if they eliminated the debt to Mrs. Dwyer, he undertook to find out from her how much was owing.

He testified that when Mrs. Henderson later called at his office, he informed her that Mrs. Dwyer told him $1,500.00 was still owing on the old Maryland case, and that his visitor volunteered to collect it. He said he advised her that any money collected would not be for him but for Mrs. Dwyer's fee in the old case, and that the rest of the conversation was concerned with a discussion of possible defenses to the charges and eliciting information on the circumstances of Henderson's flight. His recollection of the second visit was that Mrs. Henderson arrived with Mrs. Gray; they again discussed probable trial tactics, that Mrs. Gray volunteered that she had some money for him, and that he directed her to leave it with his secretary, who would give her a receipt. On the day of the trial, he recalled that he was surprised at discovering that the government had a number of eyewitnesses to call, of whom he had been unaware, that he vainly moved for a continuance, and that in the midst of his confusion, Mrs. Gray suddenly appeared and gave him some money for which he wrote a receipt on the back of a card. He then proceeded to go to trial.

According to respondent, he deposited both payments in a joint checking account he still maintained with his estranged wife, in which money received by the firm was regularly deposited. He testified that he had notified his wife of this, and that her money was still in the account, unwithdrawn.

Respondent's account of what he said to Mrs. Henderson on her first visit to the office was substantially corroborated by his daughter, Maureen, one of the two secretaries present when this interview occurred. Mrs. Dwyer, also called as a witness for respondent, was not asked whether her husband had ever inquired before any pay-

ments were made as to what the unpaid balance of the old Henderson debt amounted to. She did testify, however, as to an approximate sum of $1,500.00 being still owed and that she learned from her husband that some payments were being made, but decided not to draw them out after she heard of the Henderson complaint. She specifically denied that she had ever told Mrs. Henderson the unpaid balance was only $300.00, and also estimated that even after the 1974 payments of $1,200.00, receipted for by respondent, some $200.00 was still due.

While she was on the stand, Mrs. Dwyer was at pains to point out that she did not have the benefit of any records and that her testimony was based solely on recollection. To rebut her testimony, Bar Counsel called her former associate, David Lamb, who had ceased to be a partner of respondent after the firm was dissolved. He testified that he could not recall Jean Dwyer ever setting a fee for one case in excess of $1,500.00. In its findings, the hearing committee "attribute[d] some significance to David Lamb's unchallenged testimony that neither Jean Dwyer nor he had ever billed more than $1500 for a single criminal representation."[8]

To support the complaint, three other members of the Henderson family who had contributed money were called to the stand by Bar Counsel: (1) Lynwood Henderson (father of the complainant), who went with Yvonne Henderson to respondent's office on the occasion she testified that he agreed to represent her husband only on condition that he would receive a $1,500.00 fee; (2) Mrs. Gray, who made the first payment in the office and the second in the courtroom at the trial; and (3) Mrs. Ford, the sister, who testified that she was present when Yvonne Henderson telephoned respondent on the day Henderson surrendered. While all three indicated that the payments were made to compensate respondent for repre-

8. The hearing committee's reason for so doing is not clear, as the witness admitted that he was not present when Mrs. Dwyer made the fee arrangements in the Henderson case nor did he ever say that a quoted retainer by her for a particular sum would necessarily cover such contingencies as a second trial.

sentation in the murder trial, none of them had firsthand knowledge of this.

Questions to the witnesses brought out that (1) Lynwood Henderson, although present in respondent's office on the day Yvonne Henderson was told that $1,500.00 was due, never heard respondent say that he would not defend his son in the pending trial unless he received the $1500; (2) Mrs. Gray, who made the payment at the second visit, did not hear for what purpose it was made as "they [Mrs. Henderson and Dwyer] were talking low . . . and I actually didn't hear him tell her that;" and (3) Mrs. Ford admitted that she was too far away to overhear what her sister-in-law said on the telephone. Thus none of these witnesses corroborated Yvonne Henderson on any of the factual issues raised by the conflict between her testimony and respondent's. Respondent made a point of this in oral argument before us. Bar Counsel conceded that this was so.

Pointing out that the findings adopted by the Board turned on questions of credibility [9] and largely rested on the testimony of one witness, the wife of the complainant, contradicted in crucial respects by respondent, his legal secretary, and Mrs. Dwyer, respondent argues that the evidence against him fell far short of the kind of convincing proof essential to an order of suspension or disbarment. Bar Counsel contends, however, that because the hearing committee heard the testimony and observed the demeanor of the witnesses its resolutions of credibility should be accepted, and that in any event its findings—deemed supportable by the Board—should not be set aside as there was supporting evidence in the record.

Respondent also contends that such findings were improperly influenced by evidence that never became part of the hearing record. Our analysis of the record impels the conclusion that this contention has merit. It is fundamental that any findings of fact which depend in whole or in part on documents which were never admitted into evidence cannot be permitted to stand.

The record reveals that at some unspecified time prior to the hearing, the Bar Counsel's staff transmitted a number of documents to the hearing committee which were then examined and read by each member. These were marked as exhibits, but when the hearing committee formally convened, respondent's counsel refused to agree to their admission en masse. This resulted in an off-the-record conference between opposing counsel at which Bar Counsel agreed to the withdrawal of certain exhibits, until formally offered and admissibility ruled upon. When the hearing reconvened, respondent's counsel moved the committee to disqualify itself on the ground that its members had already seen this material. The committee denied this motion. In its report, the committee stated:

> Each member of the Hearing Committee is of the view that he or she has been able, in making findings of fact, to disregard the "withdrawn" Bar Counsel exhibits and to base the findings on testimony given at the hearing and is convinced that the findings would have been the same in any event.

The Disciplinary Board itself was disturbed by this procedure. It observed that it did not "condone the practice of lodging with members of the Hearing Committee for their examination prior to the hearing documents whose admissibility has not yet been agreed upon or established." Nevertheless, the Board, relying upon the disclaimers of the committee, stated that it was satisfied that respondent suffered no prejudice. What the Board overlooked was the paradox that the hearing committee, notwithstanding its disclaimer, actually attached some weight to one of these documents. On page 5 of its report, the committee said:

---

9. The hearing committee itself stated that "its crucial finding turns upon questions of credibility." In resolving conflicting testimony, however, the committee disclaimed that its observation of the witnesses on the stand entered into its considerations, for it expressly noted that "the demeanor of the witnesses did not detract from their testimony."

Each member of the Hearing Committee had, in fact, read the exhibits in question. Some of these would have had probative value if offered and admitted into evidence, particularly BC 11. That withdrawn exhibit purported to be a copy of a letter written on April 25, 1974, to Henderson by his wife (who testified at the hearing and could have been cross-examined about the letter). The letter says that respondent was denying that he was "court appointed" and that Henderson's family were trying to raise $1,500.00 to pay respondent to represent Henderson, and clearly implies that respondent would not represent Henderson unless the $1,500.00 were paid. This letter is entirely consistent with the testimony of Henderson's family and is directly in conflict with the testimony offered in behalf of respondent. Being written shortly before Henderson's trial, it is also in conflict with respondent's theory that it was only after Henderson's conviction that he and his family, disappointed with the conviction, adopted the position that the money they paid respondent had been paid to him for representing Henderson.

In view of the foregoing, we cannot accept the Board's conclusion that respondent suffered no prejudice, for it is obvious that at least one of the nonadmitted documents helped to shape the committee's thinking.

It should also be noted that the underlying premise of the committee was that the letter, including the date, was authentic notwithstanding that Assistant Bar Counsel on second thought deliberately decided not to offer it in evidence after questioning one witness about it. Quite conceivably counsel might have thought the witness, Mrs. Henderson, would have had difficulty in explaining why she decided to write to her husband rather than discuss personally with him her own dealings with his lawyer. There is nothing in the record to suggest that the wife was being denied conventional visitor's privileges when Henderson was in the local jail awaiting trial. The committee, moreover, did not explain how the withdrawn exhibit could have been admissible as rebuttal to "respondent's theory" as

during the hearing it sustained objections to cross-examination designed to elicit facts supporting such theory. Thus the hearing committed itself prevented "respondent's theory" from being litigated—possibly because it accepted as fact, certain statements in a document never offered for the record.

To what extent, if any, other findings of the hearing committee may have been affected by *a priori* knowledge of the contents of Bar Counsel's files is not clear. What is disturbing, however, is that some of the subsidiary findings mentioned by the committee for arriving at its ultimate resolution of credibility are lacking in evidentiary support. Under the heading "Findings Relevant to Charges" the first two paragraphs of that portion of the report read:

We accept the assertions of Henderson's family that respondent would continue to represent Henderson in 1974, after Henderson surrendered, only if respondent was paid $1,500.00 for that representation, and that the approximately $1,200.00 that the family paid to respondent in April-June, 1974, was paid for that representation and not for Jean Dwyer's prior representation in the rape case in Maryland.

Since this crucial finding turns upon questions of credibility and since the demeanor of the witnesses did not detract from their testimony, it may be helpful to discuss the conflicting evidence. First, the testimony of Henderson's family was direct, unequivocal, and unshaken by thorough cross-examination by respondent's counsel. Moreover, it is clear that obtaining the $1,200.00 involved considerable effort and sacrifice on behalf of his family, and it seems incredible that they would do so without some perceived compelling necessity, such as obtaining the services of a highly skilled and experienced lawyer to defend a homicide charge.

The final section of the report captioned "Conclusions and Recommendations" begins with the following paragraph:

The first violation of the disciplinary rules that is charged in the petition is that respondent engaged "in conduct involving dishonesty, fraud, deceit, or misrepresentation." We conclude that this offense has been established both by respondent's conduct in indicating to Henderson's family that he was not court appointed and it was appropriate to pay him for his representation of Henderson and his related receipt of payments for that purpose, and by respondent's filing a voucher under the Criminal Justice Act for compensation of his representation of Henderson, which voucher indicated that he had not received any other compensation.

The key words in the three quoted paragraphs are "Henderson's family", which plainly imply that all four of the complainant's relatives who took the stand testified they had been told by respondent or had heard him say that he was requesting, demanding, or receiving money from them to represent Henderson in the murder case. As previously noted, only Yvonne Henderson testified to that effect, for in response to questions on the stand each of the other three, the mother (Mrs. Gray), the father (Lynwood Henderson), and the sister (Mrs. Ford), conceded that they had overheard no statement by respondent relating to the purpose of the payments, nor had respondent said anything to them directly on the subject.[10] Thus, this finding, insofar as based upon testimony by the "family", is not based on substantial evidence in the record.

Nor is there any evidence to sustain the conclusionary finding that respondent engaged in "conduct involving dishonesty, fraud, deceit, or misrepresentation" by *inter alia* "indicating to Henderson's family that he was not court appointed." Mrs. Gray did not testify on this point; Lynwood Henderson and Mrs. Ford expressly disclaimed hearing respondent say anything about not being court appointed and, as previously pointed out, even Yvonne Henderson on cross-examination did not quote respondent as denying that he was court appointed, but rather that "[h]e just said he was no longer responsible for Nat's case, because he [ran]." (Tr. 60–61)[11] This version, of course, if accepted, portrays respondent as threatening to wash his hands of the case because of his displeasure with complainant's flight, but falls short of sustaining the finding of "fraud, deceit, or misrepresentation." Thus the only testimony of record on which this finding was based was retracted by the witness who had given it.

These findings with respect to the testimony of "Henderson's family" in contradistinction to the testimony of Yvonne Henderson, coupled with the absence of any reference in the findings to testimony by Maureen Dwyer corroborating her father's account of the office interview with his principal accuser, obviously convey the impression that respondent's version of the matter was overwhelmingly disproved by the "direct, unequivocal, and unshaken" testimony of the four family witnesses. This was certainly a major factor in the acceptance of the hearing committee's findings by the Board as "clearly supportable" for it cited the committee's characterization of the "family testimony" as one of the elements justifying the ultimate finding on the basic issue.

Of course, it was not necessary for Bar Counsel to prove respondent deceived or defrauded complainant's family in order to

---

10. Far from being "unequivocal, and unshaken by . . . cross-examination", Mrs. Gray's final concession was reluctant and contradicted an earlier statement by her. She first replied to the question "Why were you paying him, do you know?" by saying: "I was paying him for my son's murder trial." (Tr. 164) It took a further series of questions to elicit the admissions that she made the payments because requested to do so by Henderson's wife and her daughter (Tr. 164) [not the respondent] and

that when respondent received the money he did not tell her what it was for. (Tr. 169)

11. A court appointed lawyer may move to be relieved, and courts grant such motions on a showing of incompatibility. In this case incompatibility could have been demonstrated by Henderson's flight in disregard of respondent's advice, thereby subjecting respondent to questioning by the bondsman and the Bail Agency.

show that he had violated subsection (f) of the Criminal Justice Act, which forbids requesting or accepting payments outside the Act for representation furnished under the Act without judicial authorization. Accordingly, even if the Henderson relatives were fully aware that respondent expected to be compensated by the court for his efforts in defending Henderson in the murder case, respondent was not legally entitled to accept additional money from them for such efforts without obtaining court approval. On the other hand, if the payments were made to discharge in whole or in part a preexisting debt, it was not incumbent upon respondent to obtain court approval for such payments. Thus the Committee's reliance upon "respondent's filing a voucher under the Criminal Justice Act for compensation of his representation of Henderson, which voucher indicated that he had not received any other compensation" begs the question, for unless he was accepting money to pay him for the murder trial, he had in fact "not received any other compensation."

Respondent's uncontradicted testimony that Judge Pratt had approved his voucher—at least in part—notwithstanding Henderson's having made the same complaint to the judge that he filed with The Disciplinary Board, would seem to imply that the federal court did not deem the payments by the Henderson family constituted compensation for representation in the same case for which the voucher was submitted. The hearing committee did not comment upon this testimony, but the Board in rejecting this defense accepted as "dispositive the rejection by Bar Counsel during oral argument of Respondent's contention that the Office of Bar Counsel had been in communication with Judge Pratt as to this complaint prior to Judge Pratt's authorization of payment of the CJA complaint [sic]." The record before us does not include the test of the oral argument before the Board, but apparently the Board overlooked the actual testimony on this point. The transcript quotes respondent not as saying that Bar Counsel or his staff had informed Judge Pratt of the complaint, but rather that Henderson had independently complained to him.

■ Why Bar Counsel's staff never interviewed Judge Pratt about the incident is something of a mystery, for the court to which a voucher is submitted has the primary responsibility of passing upon any payments to an appointed attorney from sources outside Criminal Justice Act funds under 18 U.S.C. § 3006A(f). Thus, if Bar Counsel had presented to the federal court whatever information it had obtained during the four-month period intervening between the date of the complaint and the approval of the voucher, the trial court could have determined the factual issues in dispute. The basic charge against respondent is conduct contrary to a statute. Consequently a decision by the trial court would have been determinative, thereby obviating the need for submitting the disputed issues of fact to a hearing committee, or to the Board. Our rules governing the bar of the District deem conclusive for the purposes of a disciplinary proceeding, a final adjudication of misconduct by another court in this jurisdiction. Rule XI, § 18(8).

It is true that respondent Dwyer's handling of the payments to him by Mrs. Gray does cast a shadow on his assertion that he accepted this money for the account of his former partner. Neither the receipts which he gave Mrs. Gray nor his deposit of the money in a joint checking account in which current revenues from his law practice were also deposited lend documentation to his defense.

■ This is the worst thing, however, that can be said of respondent's slapdash method of bookkeeping. We agree with the hearing committee that if he had earmarked the money received from complainant's mother as payments to Jean Dwyer, this would "have clearly settled the present dispute in his favor." (Hearing Committee Report, page 11, n. 1). But it is stretching things to suggest that respondent should have complied with Rule XI, § 14. This rule directs an attorney to "maintain complete records of the handling, maintenance, and disposition of all funds, securities, and

other *properties of a client* at any time in his possession. . . . ." (Emphasis added.) This is plainly intended to deter lawyers from mingling trust funds with personal or firm accounts and has nothing to do with such transactions as fee payments.

Moreover, the two written receipts respondent gave to Mrs. Gray, and which were received in evidence, provide little or no support for the finding implicit in the characterization of these documents as "his related receipt of payments for that purpose," *i. e.*, representation in the murder case. Neither receipt reveals such a purpose—the first (the one given by the office secretary for the May 2, 1974 payment of $510.32) reads: "Received from Emma Gray for Nathaniel Henderson" and the second (the one written by respondent on the back of his card in the courthouse on June 22, 1974) says, "Received seven hundred dollars ($700.00) from Emma Gray for Nathaniel Henderson on account." As the same Nathaniel Henderson was the debtor on the old account, these documents do not reflect whether the old or a new account was to be credited.

So far as the deposits were concerned, these also are not conclusive of wrongdoing. Had respondent kept the money in some place or in some account to which only he had access, and failed to notify his former partner of the transaction, this would have been most damaging to his defense. But this is not what he did. He placed the payments in an account in which Mrs. Dwyer also had drawing rights. With respect to notification, the Committee's finding that respondent did not tell his former partner about the deposit rests on its premise—"it appears she [Mrs. Dwyer] was unaware of these payments until after Henderson had been convicted and had complained . . .." Mrs. Dwyer did not testify to this effect, but rather that she

learned the money was being held in escrow as a result of the charges. While Mrs. Dwyer was unable to recall the date she first became aware that money was being collected for her, the member of the hearing committee who questioned her on the point said she understood her to mean that her first knowledge of the payments occurred prior to any charge of impropriety. The witness did not contradict such understanding.[12]

Yet from Mrs. Dwyer's somewhat imprecise answer to the question, the hearing committee found that (report, *supra* at 11) "she was unaware" of the deposits in the joint account, and reasoned that if respondent had failed to inform her of such, it was unlikely that he had previously asked her what amount was still due her on the Henderson account (*id.* at 10). His testimony on this point was indeed a crucial part of his defense, but the inference that Mrs. Dwyer's testimony was in conflict with his account rests on conjecture, not the evidence. If the committee, after hearing respondent testify, was of the opinion that his version was inconsistent with something his wife had said on the stand, the committee or Bar Counsel could easily have ascertained the facts by recalling Mrs. Dwyer to the stand and asking directly whether respondent had ever checked with her as to the amount of the unpaid fee. Such question was never asked.

Nevertheless the Board in holding the hearing committee's conclusion "clearly supportable" mentioned inter alia its finding that it appeared that Mrs. Dwyer was unaware of any payments when, as a matter of fact, the record is barren of any such indication. The Board also relied on the committee findings with respect to the testimony of the Henderson "family" as well as some of the other subsidiary findings, concerning which—as we have noted—evidentiary support is lacking.

12. Q. (Mrs. Hankins) Am I to understand that you learned at one period there was some money being collected?
   A. Yes.
   Q. And then, at a later period, subsequent to that, you learned that there were some charges made concerning this money.

A. That came to my attention almost immediately because when Henderson pleaded guilty of the Bail Reform Act violation, he had quite a to-do with Judge Pratt about the fact that there had been some money collected . . . . [Tr. 96–97]

Until the adoption of the 1978 amendments to Rule XI (disciplinary rules), this court had never precisely enunciated the standard of review it would exercise with respect to a report of the Board in a disciplinary proceeding. Prior thereto the doctrine was that a lawyer should not be disbarred or suspended except upon "the clearest legal proof" or "a preponderance of satisfactory evidence" of misconduct. *In re Adriaans*, 28 App.D.C. 515, 522–24 (1907). Now, Section 7(3) of Rule XI states in pertinent part:

In considering the appropriate order, the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted.

■ This provision of the rule, in effect, gives the Board authority comparable to that of an administrative agency, to whose policies the courts will defer if the action under review is within its statutory powers. Plainly the rule was not intended, however, to confer upon the Board greater authority than that possessed by administrative agencies for, unlike agency action which is binding upon the parties unless a petition for judicial review is filed, disbarment, suspension, or censure of an attorney can be made effective only upon an order of this court. D.C.Code 1973, §§ 11–2502, 2503(b).

■ Rule XI, § 7(3) requires the court to accept the Board's findings of fact "unless . . . unsupported by substantial evidence of record." In this respect, our standard of review is virtually the same as that which we are to exercise under the District of Columbia Administrative Procedure Act, D.C.Code 1973, § 1–1510(3)(E). The term "substantial evidence", which was taken from the federal counterpart of the local act, has been held to mean "more than a mere scintilla." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). According to a lengthy opinion of the Supreme Court, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the use of these words in the Federal Administrative Procedure Act is tantamount to the scope of review in the Taft-Hartley Act, requiring acceptance of findings of fact "if supported by substantial evidence on the record considered as a whole." *Id.* at 485, 71 S.Ct. at 463. The Court observed:

Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a . . . Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. [*Id.* at 487–88, 71 S.Ct. at 464]

Under this test, it is manifest that some of the findings accepted by the Board cannot be supported. Although Maureen Dwyer's testimony of what was said in the crucial office conference between her father and Yvonne Henderson "fairly detracts from [the] weight" to be accorded the latter's version, there is nothing in either the Board or the hearing committee reports to indicate why such testimony was disregarded. The finding that respondent never communicated with his wife concerning the unpaid fee balance or the receipt of payments rests at best upon an inference drawn from a "scintilla". The deficiency of evidentiary support for the finding of "direct, unequivocal, and unshaken" testimony of Henderson's "family" is an even more serious shortcoming.

The gravamen of the "Petition Instituting Formal Disciplinary Proceedings" filed in this court by Bar Counsel prior to the submission of the matter to the hearing committee is set forth in paragraph 7 of the allegations:

7. That thereafter in April and in May, 1974, the defendant's wife, Mrs. Nathaniel B. Henderson, his mother, Mrs.

Emma Gray and his father, Mr. Nathaniel B. Henderson conferred with the respondent in his offices to obtain the respondent's continued representation of the defendant in the above Criminal Number 2277–71 and agreed to pay to the respondent for such representation $500 immediately and $1,000 within 60 days;

. . .

Although Mrs. Gray and Mr. Henderson, Sr. accompanied their daughter-in-law to the Dwyer office, by their own admissions, neither conferred with respondent about obtaining his "continued representation of the defendant in . . . Criminal Number 2277–71." Nor did they hear respondent say anything about his terms.[13]

We do not doubt what our dissenting colleague points out, *viz.*, that both parents of the complainant and the other relatives who were approached, thought that their financial contributions were for the purpose of securing legal representation in the murder case. But this impression must have been based only on what Yvonne Henderson told them. Whether her statements to them were true or false, it is obvious that her difficulties in collecting the money would have been greatly increased had not the family, as the hearing committee put it, been under "some perceived compelling necessity, such as obtaining the services of a highly skilled and experienced lawyer to defend a homicide charge." (Hearing Committee Report, page 9.)

■ Despite Bar Counsel's concession with respect to lack of corroboration on the crucial points in Yvonne Henderson's testimony, he argued that such testimony in itself provided the requisite substantial evidence for the Board's ultimate conclusion and therefore since the hearing committee had seen witnesses and observed their demeanor, the Board made no error in accepting the committee findings resolving the issue of credibility in favor of this one witness despite the direct conflict with two other witnesses. While we recognize, of course, the general rule that on credibility questions, the factfinding of hearing officers is entitled to great weight, we are not sure such rule has much relevance in a case where the factfinders expressly state that "the demeanor of the witnesses [presumably all witnesses] did not detract from their testimony."

■ In any event, the difficulty here is that the considerations urged in support of the Board's recommended order were not those upon which its action is based. While an order of a trial court must be affirmed if the result is correct "although the lower court relied upon a wrong ground or gave a wrong reason" *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937), the validity of an agency order must be judged on the grounds upon which the record discloses its decision was predicated. *See S. E. C. v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462 (1943), where the Court decided:

> We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.

■ Accordingly, under our amended rules, which treat the findings of the Board like those of an administrative agency, its conclusion and recommended order cannot be sustained, as such conclusion relied upon reasons given by the hearing committee which are not founded upon substantial evidence in the record and whose proceedings were seriously flawed by its examination of documents not admitted at the hearing.

Another flaw in the recommended disposition is a misreading of the federal statute upon which the recommendations are based, *viz.*, the Criminal Justice Act of October 14, 1970, Pub.L. 91–447, 18 U.S.C. § 3006A. The pertinent provisions are set out in subsection (f):

---

**13.** The wording of the complaint (or petition, as it was captioned), cannot be viewed as a mere formality. The applicable statute, D.C.Code 1973, § 11–2503(b) requires "written charges . . . under oath," be presented to the court and served personally on the accused "stating distinctly the grounds of the complaint." The Board overlooked this major variation between pleading and proof.

Receipt of other payments.—Whenever the United States magistrate or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, to any person or organization authorized pursuant to subsection (e) to render investigative, expert, or other services, *or to the court for deposit in the Treasury as a reimbursement to the appropriation,* current at the time of payment, to carry out the provisions of this section. Except as so authorized or directed, no such person or organization may request or accept any payment or promise of payment for representing a defendant. (Emphasis added.)

It was apparently the last sentence of this section upon which the complaint against respondent was predicated. We say "apparently" because Assistant Bar Counsel at the hearing asked that a copy of the D.C. Criminal Justice Act of 1974 be placed in the record. Ignoring its lack of applicability to trials in a federal district court, the committee agreed to take judicial notice of this statute, which contains a provision—not in the federal act—defining the unauthorized acceptance of a fee by an appointed attorney as a criminal offense. D.C. Code 1978 Supp., § 11–2606(b). Whether The Disciplinary Board's appraisal of the gravity of respondent's conduct stemmed from a tacit assumption that he violated a criminal provision of the federal act is not clear from its opinion.[14]

■ What is clear, however, is that both the Board and the hearing committee failed to heed the opening sentence of subsection (f), for the recommendation that "restitution" of the $1,210.00 be made to the Hendersons as a condition of respondent's reinstatement is not one that this court could adopt. The statutory provision limits the option of a court which learns that funds are available "from or on behalf of a person furnished representation" to ordering payment of such funds either to defendant's counsel or to the Treasury in reimbursement.[15] Assuming that in this case, respondent had indeed received the disputed payments for his own representation of Henderson, and that this had been disclosed to the trial court, the latter then would have deducted the $1,210.00 from respondent's pending voucher of some $1,950.00, or if this had already been disbursed, ordered respondent to send a check to the Treasury in this amount. In short, the provision of the act which respondent is charged with violating—*viz.,* unauthorized acceptance of a fee—was enacted to protect the taxpayers—not the families or friends of defendants who raise money for their legal representation. If the scheme of the statute were different, it would put a premium on the filing of dishonest affidavits of indigency [16] and deter appointed counsel from reporting the availability of private funds to trial courts which had accepted such affidavits on their face.[17] Hence, even if the findings of fact by the Board were sup-

---

**14.** The hearing committee did cite the applicable statute correctly in its report.

**15.** Plainly the first alternative refers to situations in which no fee has as yet been paid under the Criminal Justice Act and consequently there is no occasion to reimburse the Treasury. It is not uncommon for trial judges if they discover that a family of an asserted indigent has some resources to order at least partial payment by them of an appointed counsel's fee.

**16.** The Board in characterizing the Henderson family as "indigent" evidently accepted the hearing committee's statement that "it is clear that obtaining the $1200 involved considerable effort and sacrifice on behalf of his family." There is nothing in the record to support this finding. Mrs. Henderson did testify that Jean Dwyer knew they were not rich, but no evidence of unemployment or absence of resources was ever offered. But even if the Board's assumption could be documented, its proposed remedy is not one that any court is authorized to adopt.

**17.** In practice, the courts rely on the Public Defender Service to investigate the financial representations of affiants, but frequently discover that the staff of that agency has made only superficial inquiry, if any.

ported by the requisite substantial evidence, its proposed reimbursement of the complainants would have to be rejected as a matter of law.

*Petition dismissed, and the case remanded to the Board for appropriate disposition consistent with this opinion.*

MACK, Associate Judge, dissenting:

A Hearing Committee and the Board on Professional Responsibility have found that respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, and in conduct prejudicial to the administration of justice. We are required to accept the findings of fact of the Board unless they are unsupported by substantial evidence of record. Rule XI, Section 7(3). I have carefully reviewed the record, including the transcript of testimony, and I am satisfied that these findings are supported by substantial evidence.

As the majority opinion notes, there is no dispute that respondent personally received the sum of $1,210.10 from Mr. Henderson's family at a point in time when he was representing Henderson, pursuant to the Criminal Justice Act, on a murder charge. The issue is rather whether that sum was paid for respondent's legal services on that charge, as Henderson's family claimed, or whether the money was given on account of a prior legal debt owed by Henderson to respondent's wife, as respondent claimed.

The evidence shows that a first payment of $510.10 was made in respondent's office a week after Henderson surrendered for prosecution on the murder charge. A second payment of $700.00 was made to respondent on the day of the murder trial in the courthouse (the same courthouse where respondent's then estranged wife, a United States Magistrate, presumably had an office). The receipts signed by respondent made no reference to a prior debt or to his wife.

Henderson's wife testified that, at the time of her husband's surrender, she contacted respondent who told her he was no longer representing her husband under the Act. She then inquired if he would take the case for a fee; respondent said he would do so for $1,500.00 but wanted $500.00 within a few days and the remainder within sixty days. The majority, in attacking the Board's findings, repeatedly avers that other members of the Henderson family did not testify that they heard respondent say that he was receiving money for his services in the murder case. But the majority agrees and the testimony shows, that Henderson's father, his mother, and his sister thought they were pooling their resources (together with those of his wife, another sister and a cousin) to pay respondent to represent Henderson for murder. The father and the mother testified, respectively, that respondent said he wanted $500.00 "before he appeared in court," or "down," and the balance within sixty days. Henderson's wife did affirm the existence of a prior debt to respondent's wife but she, and his father, denied that respondent discussed the prior debt with them; his mother denied hearing a discussion of a prior debt.

Respondent denied that he was charging Henderson's family for his services in the murder trial. He testified that the family insisted on closing out a $1,500.00 debt to his wife out of fear that its existence would trigger retaliation from him in the representation of Henderson. His testimony was supported by his daughter—who, as his legal secretary, said she was within hearing distance of the first office consultation. There was no documentary evidence supporting his story. The majority admits that the signed receipts, and respondent's deposit of the sums in a checking account in which current revenues from his practice were also deposited, does "cast a shadow" on his story.

The testimony of the United States Magistrate, in my opinion, hardly corroborates respondent's story to the extent implied by my colleagues. She confirmed the existence of the prior debt—a matter not in dispute except as to amount. She gave no indication that she, then estranged from respondent, was ever contacted by respondent with regard to its collection. She

learned that "some money" had been collected by respondent when the alleged impropriety surfaced. Her trial records were not available and her memory dimmed through the passage of time. Her estimates of the initial amount of her fee, and the payments made on that fee were at odds with the recollection of her former partner as to general practice and the records he produced.

In my view, this record provides more than substantial evidence supporting the findings of both the Hearing Committee and the Board. We are thus required to accept the Board's findings. I find it shocking that the majority of this court could conclude that the Board's order must fail because its "conclusion relied upon reasons given by the hearing committee which are not founded upon substantial evidence in the record." In this regard the very length of my colleagues' analysis speaks more eloquently than I can.

Moreover, I think it most inappropriate for this court to usurp the function of the Hearing Committee* in judging the credibility of witnesses. In the circumstances of this case, the conclusion of the factfinder is important. *See Bar Association of Baltimore City v. Marshall*, 307 A.2d 677, 680–81 (Md.Ct.App.1973) "[W]hile we can match one statement with another, witness by witness, from the record before us, on credibility we are not in as good a position as the [trier of fact] was to judge who is and who was not telling the whole truth." *In re Gamblin*, 458 S.W.2d 321, 323 (Mo.1970). *See also In re Lurie*, 113 Ariz. 95, 546 P.2d 1126 (1976) ("we will nevertheless give serious consideration to the . . . findings and recommendations of the [trier of fact] . . . when the determination of ultimate facts rests on the weight and credibility of witnesses who have testified in person

before that committee"); *Greenbaum v. State Bar*, 15 Cal.3d 893, 903, 126 Cal.Rptr. 785, 790, 544 P.2d 921, 926 (1976) ("when findings rest primarily on testimonial evidence, the decision of the local committee, which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony, must be given great weight"); *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616, 620 (1975), *cert. denied*, 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976) ("credibility is an issue particularly within the province of the trier who views the testifying witness").

I would adopt the recommendations of the Board, both as to suggesting discipline and restitution. *See In re Wild*, D.C.App., 361 A.2d 182, 184; Rule XI, Section 7(3). I do not agree that the proposed restitution to Henderson's family must be rejected as a matter of law. The question here is not what the court could have authorized pursuant to statute if it had known that the indigent's relatives were scraping together funds for payment on behalf of the indigent, but whether these relatives, having been defrauded by an attorney who accepted their money without authorization and in prohibition of that statute, should be made whole.

I would note finally that it has been suggested that there is an endemic inability on the part of the organized profession to regulate its own members. (*See* F. R. Marks & D. Cathcart, Discipline Within the Legal Profession: Is it Self-Regulation? (Research Contrib. No. 5, American Bar Foundation (1974).) Our Bar has made a good and conscientious beginning in its self-regulatory responsibility. (*See* separate statement of Associate Judge Gallagher on petition for rehearing en banc, *In re Kleindienst*, D.C.App., 345 A.2d 146, 152–54

---

* The majority lifts a paragraph from the Hearing Committee's report and offers it as proof that the Committee attached some weight to a document not in evidence. (*See* p. 6 *supra*.) What the paragraph represents is the Committee's thinking as to why this particular document would have had probative value *if* offered and admitted; The Committee's "disclaimer"

immediately follows the paragraph—a disclaimer noting that each member was able to disregard the "withdrawn" exhibits, was able to base findings on testimony given at the hearing, and was convinced that the findings would have been the same in any event.

The Board properly found that respondent had suffered no prejudice.

(1975)). The manner in which this court treats the recommendations of the Board on Professional Responsibility is crucial to the integrity of the profession and the expectations of the public with respect thereto.

I respectfully dissent.