**In re Michael X. MORRELL,**
**Respondent.**

**A Member of the Bar of the District**
**of Columbia Court of Appeals.**

**No. 95–BG–1794.**

District of Columbia Court of Appeals.

Argued Oct. 8, 1996.

Decided Oct. 28, 1996.

John D. Cline, with whom Nancy E. Weiss was on the brief, for respondent.

Julia L. Porter, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, and Michael S. Frisch, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before FERREN, STEADMAN, and RUIZ, Associate Judges.

FERREN, Associate Judge:

The Board on Professional Responsibility concluded that Michael X. Morrell, respondent, violated several provisions of the Code of Professional Responsibility, including: Disciplinary Rule (DR) 1–102(A)(3) (illegal acts involving moral turpitude); DR 1–102(A)(4) (dishonest, deceitful, or fraudulent conduct); DR 9–103(A) (misappropriation of client funds); and DR 9–103(B) (failing to keep complete records and to account for client funds).[1] The Board recommended that this court impose the ultimate sanction of disbarment. Morrell makes four arguments for rejecting the Board's report and recommendation: (1) the Bar Counsel's initial complaint contained an inadequate oath under D.C.Code § 11–2503(b) (1995 Repl.) because it was not based on personal knowledge; (2) the delay in filing and prosecuting the complaint violated Morrell's Due Process rights; (3) the Hearing Committee's failure to issue its report within the 60 days required by D.C. Bar R. XI § 9(a) requires dismissal of the complaint; and (4) the Board's report failed to explain adequately why the Hearing Committee (whose findings were adopted by the Board) rejected the testimony of one of Morrell's witnesses. We hold that bar counsel's complaint under oath need not be based on personal knowledge but may be based on information and belief, that Morrell suffered no actual prejudice from the several claimed delays in the proceedings, and that the Hearing Committee's findings, which the Board adopted, as well as the Board's conclusions, were adequately explained and amply supported by the testimony and documents in the record. We adopt the Board's proposed

---

1. The Code of Professional Responsibility was in effect during the time the events in question took place.

sanction of disbarment for Morrell's flagrant violations of the rules governing attorney conduct.

## I.

The Hearing Committee found that Morrell engaged in a pattern of misconduct in the course of his legal representation of Laboratoires Besins Iscovesco (Lab Besins), a French pharmaceutical company, and its United States affiliate, LaSalle Laboratories, Inc. (LaSalle), between 1983 and 1990. The Board concluded that the findings of fact in the Hearing Committee's report were supported by substantial evidence in the record. *See In re Smith,* 403 A.2d 296, 302 (D.C. 1979). The series of events culminating in the charges before us can be summarized as follows:

In 1983, while an attorney at Warner & Stackpole, Morrell began representing Lab Besins, which was interested in marketing two drugs in the United States that it was successfully selling in France. From the outset, Morrell misrepresented to Lab Besins that he and his firm had the necessary experience to obtain approval of the drugs by the Food and Drug Administration (FDA). Shortly thereafter, Morrell left Warner & Stackpole but continued to represent Lab Besins as a sole practitioner. He agreed with Antoine Besins, who was in charge of Lab Besins' foreign operations throughout the time period at issue in this case, that Lab Besins would pay him $300,000 for submitting the drug applications to the FDA, exclusive of the costs of clinical trials that might become necessary.

In December 1984, Morrell joined the law firm of Akin, Gump, Strauss, Hauer & Feld (Akin, Gump); payments due under his retainer agreement with Lab Besins were subsequently forwarded to Akin, Gump.

After learning from the FDA in 1985 that clinical trials would be necessary to win approval for the drugs, Morrell proposed to Lab Besins that a consulting firm he owned and controlled, the Georgetown Group, be used to coordinate payments for the trials. Lab Besins was to pay the Georgetown Group for conducting the trials, but none of the money sent to the Georgetown Group was intended to compensate Morrell in any manner. By letter, Morrell informed Lab Besins that the total budget would be $300,000; however, between 1985 and 1988, he sent invoices to Lab Besins for slightly over $1,000,000, claiming that the prior budget was inadequate to complete the trials and navigate the approval process. The invoices to Lab Besins all indicated that the money was for clinical trials. Unknown to Lab Besins, however, Morrell spent almost half the $1,000,000 on personal expenses. (Morrell never provided Lab Besins with any accounting of the funds sent to the Georgetown Group to conduct the clinical trials.) Akin, Gump knew nothing about the billing arrangement Morrell established by using the Georgetown Group; nor was it aware that Morrell kept a large amount of the funds for his own use.

In 1988, Morrell, with the help of William Bologna, a friend who ran a public relations firm with significant experience in the pharmaceutical industry, negotiated a Co–Marketing Agreement between Lab Besins and the pharmaceutical company Schering–Plough. Schering–Plough agreed to make an initial investment of $7.5 million to facilitate approval and marketing of the drugs in exchange for a portion of the revenues. Under the agreement, if the FDA had not approved one of the drugs by June 30, 1990, or if both of the drugs were not approved by June 30, 1991, Schering–Plough would take over the approval and marketing process, and Lab Besins would receive only a royalty on all sales, a much less lucrative arrangement for Lab Besins. Morrell assured Lab Besins officials that the deadlines easily would be met.

Lab Besins created LaSalle to receive the Schering–Plough investment and conduct the approval and marketing operations. LaSalle was to be Lab Besins' wholly owned subsidiary. Morrell misrepresented to Lab Besins that Schering–Plough required him to be in charge of LaSalle. Lab Besins, through Antoine Besins, agreed to make Morrell president and CEO of LaSalle, with the understanding that Morrell would wind down his work at Akin, Gump and join LaSalle full-

time by the end of 1988 or the beginning of 1989. Morrell, however, continued to have Akin, Gump bill LaSalle for his legal services, causing LaSalle (whose finances he controlled as president and CEO) to pay Akin, Gump approximately $400,000 between April 1988 and April 1990. Indeed, Morrell created two copies of some of the invoices: one copy went to Akin, Gump, indicating that the bill was for legal services; the other copy was sent to LaSalle, depicting the moneys owed as charges for use of office space.

Morrell also caused LaSalle to pay Bologna $300,000 as a finder's fee for Bologna's role in facilitating the agreement between Lab Besins and Schering–Plough. Morrell informed Antoine Besins that he was making the payment. Morrell did not tell Besins, however, that Bologna was going to pay Morrell $150,000. Furthermore, Morrell created two false invoices to Bologna to cover up the "kick-back" he received.

During that same time period, while Morrell was receiving a salary from Akin, Gump and billing his services to LaSalle, he caused LaSalle to pay himself well over $1,000,000 in direct compensation. Akin, Gump required all attorneys to turn over to the firm all compensation received for professional services; it also had a policy requiring attorneys to obtain firm approval before acquiring stock in a company that was a firm client. A large majority of Morrell's billings at the firm were for services rendered to Lab Besins or to its American subsidiary, LaSalle, created in 1988 to market drugs in the United States. Akin, Gump was not aware that Morrell was receiving compensation from LaSalle, a firm client, nor was Lab Besins or Antoine Besins aware that Morrell was billing LaSalle personally for his services.

Morrell's contract with LaSalle provided that he was to receive no more than $300,000

per year, plus a bonus once the products were authorized and sold. Although his employment agreement contained no provision that he was to be compensated with company stock, Morrell caused LaSalle to issue him ten shares of stock, or approximately 9% of the company. After he issued himself the stock, Morrell filed and signed, under penalty of perjury, a false tax return indicating that Lab Besins was the 100% owner of LaSalle. Neither Lab Besins nor Bologna nor Akin, Gump was aware at the time of Morrell's ownership interest in LaSalle.

After LaSalle failed to obtain FDA approval of either drug within the deadline provided in the Co–Marketing Agreement, Schering–Plough exercised its right to take over the approval process and the marketing of the drugs. Lab Besins and Akin, Gump learned of all Morrell's activities detailed above shortly thereafter, and both terminated Morrell's employment with their respective organizations in the middle of 1990. Akin, Gump ultimately paid Lab Besins and LaSalle $3.2 million to settle their claims against the firm.

Laurence Hoffman, the managing partner of Akin, Gump, filed a complaint against Morrell with the Office of Bar Counsel on July 14, 1992, shortly after the firm had reached a settlement agreement with Lab Besins. The Office of Bar Counsel filed a petition instituting formal disciplinary proceedings in March 1994, following an extensive period of discovery and consideration of the allegations against Morrell.

The Hearing Committee, and then the Board, concluded that Morrell had violated DR 1–102(A)(3), DR 1–102(A)(4),[2] DR 9–103(A),[3] and DR 9–103(B).[4] Morrell misappropriated hundreds of thousands of dollars sent by Lab Besins to the Georgetown Group to conduct clinical trials, caused LaSalle to

---

**2.** DR 1–102(A) provides, in relevant part: "A lawyer shall not: ... (3) Engage in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law. (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

**3.** DR 9–103(A) provides, in relevant part: "All funds of clients paid to a lawyer or law firm other than advances for costs and expenses shall be deposited in one or more identifiable bank

accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein...."

**4.** DR 9–103(B) provides, in relevant part: "A lawyer shall: ... (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

pay him funds well in excess of his authorized salary, received a salary from Akin, Gump while receiving compensation directly from LaSalle for performing the same legal work, and received an undisclosed kick-back from Bologna. Because of his failure to keep proper records, it is impossible to determine at this point precisely how much he stole. The evidence of record, however, is more than sufficient to constitute dishonest behavior under DR 1–102(A)(3), namely theft and fraud, which also violates DR 1–102(A)(4) (proscribing illegal acts involving moral turpitude) and DR 9–103(A) (misappropriating client funds). Finally, Morrell failed to provide any accounting of the funds sent by LaSalle and Lab Besins to the Georgetown Group, in violation of DR 9–103(B).

Respondent does not dispute that if this court accepts the facts as found by the Hearing Committee and the Board, he violated the Disciplinary Rules cited above. He contends that procedural violations, as well as the Committee's and the Board's inadequate attention to one of his own witnesses, requires us to reject the Board's report and recommendation.

## II.

Morrell contends that the Board should have dismissed the complaint as inadequate to satisfy the statutory oath requirement. He argues, more specifically, that because Bar Counsel did not comply with D.C.Code § 11–2503(b) (1995 Repl.), requiring presentation of "written charges, under oath" to the court, he may not be disciplined in this proceeding.

The statute governing attorney disciplinary complaints states, in relevant part: "[A] member of the bar may not be censured, suspended, or expelled under this chapter until written charges, *under oath*, against that member have been presented to the court, stating distinctly the grounds of the complaint." D.C.Code § 11–2503(b) (emphasis added). The complaint filed against Morrell included the following verification by Assistant Bar Counsel Julia L. Porter: "I … do affirm that I verily believe the facts stated in the petition to be true." Morrell does not question that the facts in the petition "stat[e]

distinctly the grounds of the complaint," as required, but he contends that the affirmation is defective because it is not based upon the personal knowledge of the individual swearing out the complaint. The petition also falls short, according to Morrell, because it asserts that Assistant Bar Counsel only "believe[s]" the allegations to be true rather than containing an unconditional affirmation that the allegations in fact are true.

Counsel for Morrell acknowledged at oral argument that neither the Constitution nor the statutory language itself precludes an interpretation of § 11–2503(b) that would permit an Assistant Bar Counsel to satisfy the oath requirement by swearing or affirming on information and belief that the facts stated in the petition are true—as occurred in this case. But that interpretation is forbidden, according to counsel, by this court's decision in *In re Williams*, 464 A.2d 115 (D.C.1983) (per curiam) (*Williams I* ).

In *Williams I,* the respondent attorney failed to answer three petitions charging him with misconduct, and the Board deemed those charges admitted. *Id.* at 117. No sworn evidence was taken by the Hearing Committee or the Board; the only "evidence" against the attorney was Bar Counsel's averment, under oath, that there was probable cause to refer the charges to a hearing committee. We held that the Board's reliance upon this particular sworn assertion violated Williams' right to due process; even in a case where the attorney failed to respond, the hearing committee should have held an ex parte proceeding to receive evidence before recommending a sanction. We accordingly remanded the case for a hearing that satisfied due process. *Id.* at 118–19.

In *Williams I,* we rejected the attorney's initial contention that a deficiency in the verification of the petitions, in violation of the oath requirement of D.C.Code § 11–2503(b), required dismissal of all charges. In ruling that the petitions were not subject to dismissal, we relied not on the particulars of Williams' "oath deficiency" argument but on the simple fact that he had proceeded to a hearing on the petitions without objecting to the form of verification. "[S]ince the lack of

verification of a petition is not a jurisdictional defect, respondent has waived any defect by failing to object timely." *Williams I*, 464 A.2d at 118 (citations omitted). The very case that Morrell relies upon to support his interpretation of the statute, therefore, rejected the proposition that violation of the verification provision inherently deprives this court of the power to discipline an attorney.

In the present case, however, counsel for Morrell—unlike Counsel for Williams—objected to proceeding before the hearing committee with a petition lacking a sworn statement that the facts alleged were true based on the petitioner's own personal knowledge, or based on the complainants' personal knowledge verified by affidavit annexed to Bar Counsel's petition. Accordingly, although *Williams I* concluded that a disciplinary proceeding could go forward without a properly sworn petition if the defect was waived, the court did not have to decide, and thus clearly did not reach, what exactly the statutory oath requirement is—an issue preserved for our review here by Morrell's timely objection.

■ The issue thus presented is (1) whether, as Morrell contends, the petitioner (meaning Bar Counsel) must aver under oath, or present a complainant's sworn affidavit, that the alleged facts are true based upon personal knowledge, or (2) instead, as Bar Counsel argues, the petitioner can satisfy § 11–2503(b) by affirming or swearing that the alleged facts are true based on information and belief.

It is important, first, to look at the language of § 11–2503(b), and especially at what the statute does *not* say. Nowhere does § 11–2503(b), requiring "written charges, under oath," explicitly state that the charges must be based upon the personal knowledge of the individual filing the petition. Nor does the statute expressly require the oath to be given by a person having personal knowledge of the facts in dispute. Furthermore, there is no legislative history that suggests a personal knowledge requirement. Accordingly, there literally is room in the statutory language for the filing of a petition by a prosecuting official who is not personally a complainant and who thus verifies the charges

under oath based on information and belief. Morrell, therefore, concededly premises his argument on a *Williams I* footnote that discusses whether the verification in that case was sufficient under the statute:

> Two petitions, 232–79 and 399–79, contained an oath by Assistant Bar Counsel that probable cause exists to refer the charges to a hearing committee. This does not fulfill the oath requirement of § 11–2503(b) since Bar Counsel has no personal knowledge of the facts upon which the charges are based and has sworn not to the truth or falsity of those facts, but only to the existence of probable cause.

*Id.* at 118 n. 6. Morrell interprets this footnote as imposing upon Bar Counsel an obligation to obtain sworn affidavits based upon personal knowledge to support every petition for attorney discipline. We cannot agree, for two reasons.

In the first place, the *Williams I* footnote is pure dictum. In relying exclusively on a waiver of Williams' oath argument as the basis for permitting the case to stay in court, this court theoretically could not, and did not, opine on the merits of Williams' contention.

Second, *Williams I* was a default case. Although stating that the Assistant Bar Counsel's affidavit "does not fulfill the oath requirement," the *Williams I* footnote should not be accorded persuasive weight because the central focus of that decision was not on its sufficiency for purposes of the oath requirement but on the sufficiency of the petitioner's affidavit for proof of the charges upon the respondent's failure to appear. In supplying the footnote, therefore, the court was narrowly focused, having no reason to consider the broader context, reflected in the present case, where the court must think about the two levels of verification required, respectively, at the petition stage and, later, at the evidentiary hearing. That broader issue, however, is squarely before us now in this case of first impression.

We conclude that no legal significance attaches to the fact that Assistant Bar Counsel in the present case affirmed merely that she "verily believe[d]" that the allegations in the

petition were true rather than swearing unequivocally that the facts recited therein were actually true. The "verily believe" formulation is adequate in other legal contexts. For example, the rules of civil procedure applicable in this jurisdiction provide that "[w]hen verification of a pleading is required, it shall be sufficient for the person verifying to swear or affirm that the person verily believes the facts stated in the pleading to be true." Super. Ct. Civ. R. 9–I(a). We have held, moreover, that a grand jury may issue an indictment without receiving the sworn testimony of anyone with first-hand knowledge of the facts at issue. *See Chambers v. United States,* 564 A.2d 26, 29 (D.C.1989) (citing *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956)). Similarly, a criminal information filed pursuant to Super. Ct.Crim. R. 7(a), (c) is typically not based on the prosecutor's personal knowledge. We therefore see no reason for inferring from D.C.Code § 11–2503(b) a more stringent standard for bar disciplinary cases, especially when the role of Bar Counsel, as petitioner, as well as the notice, evidentiary hearing, and proof requirements, are examined.

Bar Counsel's role in the investigation and prosecution of disciplinary actions, as provided by the Bar Rules promulgated by this court under the authority of D.C.Code § 11–2501(a), suggests that Morrell's proposed personal knowledge requirement would be an ill-advised policy. Bar Counsel conducts all investigations and is the only person with the authority to institute formal disciplinary proceedings before a Hearing Committee. D.C. Bar R. XI § 8. To present formal charges, Bar Counsel must file "under oath" a petition "sufficiently clear and specific to inform the attorney of the alleged misconduct." D.C. Bar R. XI § 8(c). This language mirrors the statutory requirements in D.C.Code § 11–2503(b) and, in context, envisions that it is enough for Bar Counsel (or an Assistant Bar Counsel) to file the petition under oath based on information and belief. Such an oath satisfies the need at the charging stage to assure that Bar Counsel, an officer of the court, has investigated the complaint and has sound reason to believe the charges are well founded. The rule adopted by this court,

incorporating this oath requirement, thus implements the governing statute in an entirely reasonable manner that fully preserves the rights of the accused attorney, providing for detailed notice of the charges and an elaborate procedure for hearing sworn testimony before any discipline can be imposed.

It would serve no purpose to impose an additional requirement that Bar Counsel obtain, organize, and incorporate in the petition a series of affidavits by all the varied parties with personal knowledge of the facts underlying the charges. As Bar Counsel correctly notes in the brief, "[i]t is at the hearing that Bar Counsel must put on its proof, including the sworn testimony of witnesses, to support the charges." We decline to create a scenario where a mini-trial might be required to confirm the sufficiency of the petition prior to the actual proceedings before the Hearing Committee. To the extent the *Williams I* dictum suggests otherwise, it must be rejected as inconsistent with the statute itself and with this court's rules governing attorney discipline.

■ Even if we were inclined to agree with Morrell that the statute requires verification of the written charges based upon the verifier's personal knowledge, Morrell can demonstrate no prejudice whatsoever from this alleged statutory violation. He cannot and does not allege any prejudice flowing from the purported failure of Bar Counsel to comply with the oath requirement of the statute. *Cf. Chambers,* 564 A.2d at 29 (holding that court would not inquire into sufficiency of evidence to support grand jury indictment since any error in grand jury process is rendered harmless by petit jury's finding of guilt beyond a reasonable doubt). Morrell vigorously contested the charges, and the Hearing Committee heard nine days of sworn testimony before making its findings of fact. Bar Counsel's petition served its constitutional function of putting Morrell on notice of the specific allegations raised against him. Even were it insufficient, therefore, the verification simply did not prejudice Morrell in any way.

### III.

■ Morrell next contends that Akin, Gump's delay in referring the charges to the Office of Bar Counsel, when combined with Bar Counsel's delay in prosecuting the complaint, compels dismissal of the charges. Morrell concedes, as he must, that mere delay in the disciplinary process generally does not provide a legitimate ground for dismissal of the complaint. The public interest in regulating members of the bar takes precedence over the attorney's interest in having claims speedily resolved. *In re Williams*, 513 A.2d 793 (D.C.1986) (per curiam) (*Williams II*). In *Williams II*, we rejected the Board's recommendation for dismissal of a petition solely on speedy trial grounds as "an inappropriate method of effecting the disciplinary rules." *Id.* at 797.

■ If delay in the prosecution of disciplinary charges substantially impaired the attorney's ability to defend against the charges, however, the Constitution might compel a different analysis: "A delay coupled with actual prejudice could result in a due process violation." *Id.* Morrell contends that the delay in his case deprived him of due process by limiting his ability to cross-examine Bar Counsel's witnesses because of their lack of memory. Morrell further contends that his own difficulty in recalling critical events impaired his ability to testify on his own behalf and to withstand cross-examination by Bar Counsel. According to Morrell, "witness after witness claimed loss of memory on key issues." Bar Counsel argues in response that the witnesses' memory lapses were on tangential matters such as the precise date on which a given conversation occurred.

The Hearing Committee found "insufficient evidence that the delay ... has prejudiced Mr. Morrell on the controverted issues or has distorted the fact finding process." The Committee, which of all the disciplinary authorities involved was in the best position to determine whether Morrell was prejudiced by the delay, also found that Morrell "testified with no apparent lack of recollection regarding specific conversations occurring years ago" and that the testimony of Besins and Wiriath was "reliable and credible" despite their "lapses of memory." The Board agreed that Morrell was not prejudiced, and, after our own independent review of the record citations supplied by Morrell to buttress his claim of prejudice, we also agree with the Hearing Committee. Ultimately, any fuzziness in memory experienced by the witnesses and by Morrell was on peripheral issues. As elaborated below, the witnesses had little or no trouble recalling the contents of conversations that played a role in the Hearing Committee's and Board's conclusions that Morrell violated numerous disciplinary rules.

Morrell initially cites several instances where Antoine Besins, the director of overseas operations for Lab Besins, claimed a failure of memory in his testimony before the Hearing Committee. Although Besins undoubtedly was a very important witness for Bar Counsel, his failures of recollection did not go to the heart of his testimony. For example, Besins was unable to recall the precise week or month when he reached the employment agreement with Morrell to head LaSalle, and Besins could not remember whether the meeting where they finally reached an agreement took place over the telephone or face-to-face. While this testimony was related to a key issue—the terms of Morrell's employment contract with LaSalle—Besins had no difficulty testifying to the substance of the agreement in question. Similarly, Besins could not recall when he told Morrell that Morrell's receipt of stock in LaSalle as compensation was out of the question until the company was operational, but he was adamant that he had clearly conveyed this message to Morrell.

A review of the other instances cited by Morrell where Besins' memory failed him reveals that those memory slips were on equally insignificant points. Morrell, therefore, suffered no prejudice from Besins' inability to recall details that were unimportant to resolution of the competing versions of events. Besins, for example, was unable to remember the exact time and content of conversations with Morrell concerning the finder's fee that was paid to Bologna. Nonetheless, his testimony was very clear on the one issue implicating Morrell's conduct: Besins

was not aware until long after the payment was made that Morrell was to receive half the finder's fee as a kick-back from Bologna. Besins further testified that he could not recall whether certain words had been added to a notebook in anticipation of an earlier legal proceeding. Morrell, however, was able to impeach Besins with Besins' own deposition testimony that the notebook had indeed been altered, thereby alleviating any possible prejudice purportedly resulting from Besins memory failure.

None of the other instances where Besins' memory failed him on peripheral details is any more persuasive in establishing prejudice. Specifically, during his testimony, Besins could not provide inconsequential answers such as: how many times Morrell met with Alain Wiriath, and whether Besins was present at such meetings whether it was Morrell or Bologna who made a statement at a meeting when both of them were present whether Morrell's attorney asked Besins "unfair questions" at his deposition in a civil matter, exactly how the salary expenses were budgeted for LaSalle, except for Besins' repeated recollection that Morrell was only to receive $250,000 and whether Don Conklin of Schering–Plough was reluctant to invest the $7.5 million in LaSalle when its top management was not yet in place.

The memory lapses contained in Laurence Hoffman's testimony cited by Morrell are similar in nature and also concern incidental issues. Specifically, Hoffman, the managing partner of Akin, Gump, could not recall the following: the reasons Morrell gave for leaving Warner & Stackpole and starting his own firm; contents of a meeting with Morrell concerning outstanding bills by Akin, Gump to Columbia Laboratories; the date of a meeting with Morrell when Hoffman first learned of the existence of the Georgetown Group; what Morrell told him about Morrell's becoming an officer in LaSalle; how many documents were produced in litigation between LaSalle and Morrell; whether a settlement between LaSalle and Morrell was imminent when Akin, Gump filed its complaint with Bar Counsel; how many drafts existed of Akin, Gump's initial letter to Bar Counsel; the source of certain information

about the structuring of the co-marketing agreement mentioned in the complaint letter to Bar Counsel; who made the final oral employment agreement between Morrell and Akin, Gump; whether Akin, Gump's policies concerning income and directorships were recorded in the minutes of the firm's management committee meetings; and whether the minutes reflected that some attorney sought approval for acceptance of a finder's fee in a totally unrelated matter.

Morrell further contends that he was prejudiced in his ability to cross-examine Alain Wiriath, the international lawyer who advised the Besins family. This assertion is even more far-fetched than Morrell's previously detailed claims of prejudice. Morrell claims not that Wiriath was unable to recall significant events relevant to material issues in the case, but rather that Wiriath lied on the stand and was able to get away with concocting false testimony because the Hearing Committee believed his feigned protestations of memory loss. The Hearing Committee, however, specifically found that Alain Wiriath was a credible witness, and we will not upset such a credibility finding.

Finally, Morrell contends that he was prejudiced in his ability to undergo cross-examination by Bar Counsel because he could not recall some of the details about which Bar Counsel questioned him. Many of Morrell's difficulties in recollection were eventually overcome as his memory was refreshed by documents or by the questioning itself. For example, in one passage of the transcript cited by Morrell to establish prejudice, Morrell could not recall the amount he billed Lab Besins for preparation of the first two reports investigating the possibility of bringing its products to America. The question was quickly resolved, however, by referring to the undisputed documents. Similarly, Morrell could not recall whether the annual reports he filed on behalf of the Georgetown Group in 1985 indicated that the address for the Group was Morrell's home address, but he acknowledged that Bar Counsel was correct only a few moments later after reviewing the documents. In yet another interchange cited by Morrell, he could not recall whether he was billing Lab Besins through

Akin, Gump for his expenses at the same time he was reimbursing himself for expenses through the Georgetown Group. The documents presented to him at the hearing, however, clearly indicated that Akin, Gump was billing Lab Besins for expenses for 1985–87, and Morrell did not dispute this fact during his testimony.

Ultimately, Morrell cannot show any prejudice from his failure to recall these details. Morrell postulates that his inability to recall such details made it appear that he was stonewalling Bar Counsel, but there is no evidence to support this supposition. The Hearing Committee in no way suggested that Morrell's demeanor in indicating that he could not recall certain events was critical or even significant in the Committee's resolution of credibility disputes. Rather, the Committee and the Board relied heavily upon the significant documentary evidence supporting Bar Counsel's claims and upon the absence of documents supporting Morrell's version of events. The Board noted that "[i]n sustaining the Committee's factual findings," including its resolution of credibility disputes, the Board was "buoyed by the inherent implausibility of many of [Morrell's] claims."

Morrell, moreover, was free to practice law before and during the prosecution of the claims against him. Indeed, he has been free to practice law until this opinion has resolved the case against him. We think the Board got it exactly right in concluding: "Finally, if there was any prejudice from this delay, the prejudice was to the integrity of the bar because the delay has allowed a true scoundrel to remain free to practice long after his crimes were discovered."

## IV.

■ Morrell also contends that the charges should be dismissed because the Hearing Committee failed to submit its report and recommendations within sixty days of the conclusion of the hearing as required by D.C. Bar R. XI § 9(a). Although the record was complete as of January 5, 1995, the Hearing Committee did not submit its report and recommendations until July 26, 1995, substantially after the sixty-day time

frame envisioned by the Bar Rules. Nothing in the text of the rules, however, specifies the result of a Hearing Committee's failure to adhere to the time limit, so we presume that the rule is directory, rather than mandatory. *See Abolaji v. District of Columbia Taxicab Comm'n,* 609 A.2d 671, 672 (D.C.1992). It would hardly serve the integrity of the bar, moreover, to allow Morrell to avoid the imposition of discipline for his serious ethical violations merely because the Hearing Committee took a long time carefully evaluating the substantial, complex evidence in his case.

## V.

■ Finally, Morrell argues that the testimony of William Bologna, a close associate of Morrell's, was so contrary to Besins' testimony—and so corroborative of Morrell's own version of events—that the Board erred by failing to explain, in detail, why it rejected Bologna's account. Thus, according to Morrell, we must reject the findings of the Board as unsupported by substantial evidence. We reject this argument because the Board was not required to give reasons for rejecting Bologna's testimony, which in any event did not contradict even a substantial portion of Besins' testimony, especially in light of the overwhelming weight of the documentary evidence against Morrell.

Our standard of review is a familiar one. This court "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record." D.C. Bar R. XI § 9(g)(1). We have frequently noted that the finder of fact—an agency or in this case the Board—"may credit the evidence upon which it relies to the detriment of conflicting evidence and need not explain why it favored the evidence on one side over that on the other." *United Unions, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 554 A.2d 313, 316 (D.C.1989); *see also Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 47 (D.C.1979).

Morrell does not dispute these general precepts but argues that this case falls within a narrow exception to the principle that the Board need not explain how it resolved con-

tradictory testimony. Morrell contends that this case fits within the parameter of our warning that in some cases "the evidence in support of a finding could be so weak, in contrast with evidence to the contrary, that an agency ... would have to give persuasive reasons for its reliance on particular testimony" for us to find that substantial evidence supported its decision. *Citizens Ass'n of Georgetown,* 402 A.2d at 47 n. 19. Morrell cites two cases, *In re Dwyer,* 399 A.2d 1 (D.C.1979), and *Eilers v. District of Columbia Bureau of Motor Vehicles Servs.,* 583 A.2d 677 (D.C.1990), to support his theory that the Board inadequately resolved the contradictions in the testimony before it.

*In re Dwyer* (which we decided before *Citizens Association of Georgetown* ) rejected the proposed disciplinary recommendation of the Board, concluding that: its findings were not based on substantial evidence; the Board improperly relied upon exhibits which were never made part of the record; and the Board misconstrued the statute which the attorney allegedly had violated. *In re Dwyer,* 399 A.2d at 11–14. The Board, in short, made findings that were simply not supported by the record. We characterized one such finding as resting, at best, "upon an inference drawn from a 'scintilla,' " *id.* at 11, and we concluded that other findings similarly lacked solid evidentiary support. While noting the general proposition that deference was owed to the factfinder's credibility determinations, we ultimately concluded that the Board's decision was based upon so many unsupported findings that even if the Board could have properly relied solely upon the testimony of the complainant, the Board had not done so and, therefore, its decision could not be upheld. *Id.* at 12.

*In re Dwyer* provides meager support for Morrell's challenge to the Board's decision. Here, the Board's findings rest upon solid evidentiary ground. None of its findings is totally unsupported by the record as happened in *In re Dwyer.* Perhaps the most telling fact is the overwhelming weight of the documentary evidence which generally supported the allegations coupled with a notable lack of documents to support Morrell's versions of events.

*Eilers,* also relied upon by Morrell, demonstrates conclusively that the Board's decision in the present case was adequately detailed and supported by evidence of record. In *Eilers,* we noted that while the "hearing examiner is not ordinarily required to explain why he believed one witness over another," the facts indicated that the case was an extraordinary one where more was required of the agency. 583 A.2d at 684. We noted that the testimony of the sole government witness—the arresting police officer—was so internally inconsistent that the hearing examiner was required to explain why he chose to credit only the incriminating portions of that witness's testimony and how he resolved the inconsistencies in the officer's testimony. *Id.* at 686. Special circumstances present in that case, including an extremely perfunctory hearing and at least the appearance that the examiner had prejudged critical issues, *id.* at 686–88, further bolstered our conclusion that the agency had not given "full and reasoned consideration to all material facts and issues," *id.* at 686. Clearly, no such circumstances exist in the present case, where the Hearing Committee heard nine days of testimony, received hundreds of pages of exhibits, and issued a fifty-six page report containing its recommendation. None of the testimony relied upon by the Hearing Committee and the Board was so internally inconsistent as to demand further explanation before it could be accepted, and the documentary evidence further buttressed the factfinder's conclusions.

Even if we were inclined to impose a requirement that an agency provide an explanation for why it rejected some testimony in favor of contrary evidence, the Hearing Committee and the Board have more than satisfied such an explanatory hurdle. The Board, of course, was bound by the substantial evidence standard in reviewing the factual determinations of the Hearing Committee, and the Board quite properly relied upon the Hearing Committee's findings of fact and explanations. *See In re Smith,* 403 A.2d 296, 302 (D.C.1979). Thus, it is telling to examine briefly the reasons given in the Hearing Committee's report for resolving credibility disputes as it did.

A review of that report demonstrates decisively that the Committee gave more than adequate justification for its view of the facts. Repeatedly, when confronted by a contradiction between the evidence offered by Bar Counsel and that offered by Morrell, the Committee's report carefully explained why it was choosing to credit one version of events. In largely adopting Besins' version of the terms of Morrell's contract with LaSalle, the Committee noted that its decision was "based on balancing the testimony of these two individuals, in the light of available documentation, circumstances, subsequent events, and credibility of contending claims." If the Committee had stopped there, we would likely find the decision adequately explained. The Committee, however, further explicated the reasons underlying its credibility judgments on the question of the LaSalle stock:

First, at no time did Mr. Morrell disclose to Antoine Besins, Mr. Wiriath or anyone else associated with Lab Besins or LaSalle—including his friend Mr. Bologna, who believed that he too would receive stock—that Mr. Morrell had issued himself stock in LaSalle....

Second, Mr. Morrell concealed his taking of stock in a client company from Akin, Gump....

Third, the only document reflecting the shareholders of LaSalle that was seen by persons associated with LaSalle other than Mr. Morrell—the 1988 corporate tax return for LaSalle filed in September 1989—stated that LaSalle owned 100% of LaSalle. Mr. Morrell signed the tax return as LaSalle's president ... under penalty of perjury.

This is merely one example of the Hearing Committee's thorough and thoughtful approach to resolving the factual disputes underlying the disciplinary charges against Morrell.

While it is certainly true that neither the Board nor the Hearing Committee considered Bologna's testimony in any great detail, that is quite naturally because Bologna did not have personal knowledge of most of the critical disputed events. Bologna was not a party to the negotiations between Morrell and Besins over Morrell's compensation package as CEO of LaSalle; indeed, it is essentially undisputed that Bologna did not know that Morrell issued himself ten shares of LaSalle stock. Even where Bologna was more directly involved, his testimony was not terribly probative. His testimony concerning the kickback he paid to Morrell—half of the $300,000 finder's fee that Morrell himself had LaSalle pay Bologna—hardly supports Morrell's theory that Besins knew all along that Morrell was to receive half the finder's fee. The Hearing Committee specifically found, in any event, that Morrell's testimony that Bologna asked him to create the false invoices for accounting purposes was not credible. We do not think that Bologna's testimony so undermined Bar Counsel's presentation of its case that the Committee or the Board was required to explain in detail why Bologna's version was rejected on some issues. Quite simply, the Board's decision was amply supported by substantial evidence on the record.

\* \* \* \* \* \*

 We adopt the conclusions of the Board (relying on the Hearing Committee) that Morrell violated DR 1–102(A)(4) (conduct involving dishonesty), DR 1–102(A)(3) (illegal acts involving moral turpitude), DR 9–103(A) (misappropriating client funds), and DR 9–103(B) (failing to keep complete records).[5] We also agree with the Board that

---

5. We have no reason to address the Board's conclusions that respondent did not violate the conflict of interest rules by: (1) representing Lab Besins at the same time he was negotiating an employment agreement to head LaSalle; or (2) simultaneously representing both LaSalle and Columbia Labs, a potential competitor. Bar Counsel did not except to the Board's conclusions, and given that the severity of respondent's other misconduct clearly warrants disbarment, it would serve no purpose to decide the conflict of interest question (which was neither briefed nor argued by the parties). For similar reasons, we decline to consider the Board's position that restitution would not be an appropriate condition of reinstatement, given the difficulty of determining the exact amount misappropriated by Morrell. We agree with the Board's observation that, if respondent seeks reinstatement, evidence that respondent's victims have been made whole would be "highly relevant."

disbarment is the appropriate sanction.[6] *See, e.g., In re Gil,* 656 A.2d 303, 306 (D.C. 1995) (ordering disbarment where attorney conduct amounting to larceny was implemented through deceit); *In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc) (holding that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence"); *In re Wade,* 526 A.2d 936, 939 (D.C.1987) (ordering disbarment where attorney stole money from client funds); *see also In re Pels,* 653 A.2d 388, 389 (D.C.1995) (disbarring attorney where misappropriation caused by mere recklessness).

Accordingly, respondent Michael X. Morrell shall be disbarred effective thirty days from the date of this opinion. D.C. Bar R. XI § 14(f).

*So ordered.*

---

**6.** Respondent does not contend that disbarment would be inappropriate if this court accepts the Board's findings and conclusions.